# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BIG LEAGUE CHEW PROPERTIES LLC AND
THE ROB NELSON COMPANY INC.,

       Plaintiffs,

      v.

FORD GUM & MACHINE COMPANY INC.,

       Defendant.

No. 24 CV 11837

District Judge Valderrama

Magistrate Judge McShain

## REPORT AND RECOMMENDATION

Pending before the Court are plaintiffs' motion for preliminary injunction [8, 51, 55][1] and defendant's motion for preliminary injunction [34 (sealed),[2] 52, 56]. The motions are fully briefed. For the following reasons, the undersigned respectfully recommends that the District Judge deny plaintiffs' motion [8] and deny defendant's motion [32].

## Background

This case involves the Big League Chew brand of shredded bubblegum and who owns the trade dress rights in the shredded gum configuration. In 1979, Rob Nelson, founder, president, and owner of Plaintiffs Big League Chew Properties, LLC and The Rob Nelson Company, Inc., created the first batch of shredded gum as an alternative to chewing tobacco and called it Big League Chew. [1] ¶¶ 20, 21, 36–37. In 1981, after partnering with Jim Bouton and pitching the idea to a few companies, Nelson and Bouton's company, The Jim Bouton Corporation, entered into a trademark license agreement with Amurol Confections Company, a subsidiary of the Wrigley Company, to manufacture the shredded gum product. [*Id.*] ¶¶ 38, 49. Big League Chew® shredded gum products have been sold in the U.S. since around July 6, 1981. [*Id.*] ¶ 65. The original 1981 license agreement was subsequently superseded

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

[2] The Court has found it necessary to refer to several sealed filings that the parties have designated confidential, but the Court has attempted to do so without revealing any information that could be reasonably deemed confidential. To the extent the Court has discussed confidential information, however, the Court has done so because it is necessary to explain the path of its reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

by a second license agreement in 1992 and then a third license agreement in 2002. [*Id.*] ¶¶ 50–51.

Through The Jim Bouton Corporation, Bouton applied for registration of certain trademarks and copyrights in connection with the Big League Chew® shredded gum product, including obtaining registration of "Big League Chew" in 1983. [1] ¶ 41; [8-2] 22. As of today, these registered marks include other word marks such as "Chew Smart," "The Ballplayers' Bubblegum," and "Wild Pitch Watermelon," as well as various pictures and logos. [8-2] 22–23. An application for trade dress registration of the shredded gum configuration was never filed and is not included in the list of *registered* trademarks. On or about November 15, 1999, The Jim Bouton Corporation sold ownership in the "Big League" trademarks and related intellectual property rights to the Big League Company, a company jointly controlled and owned by Nelson and Bouton and which was a sister company to The Rob Nelson Company. [1] ¶¶ 45–46. On or about November 14, 2003, the "Big League" trademarks and related intellectual property were transferred to The Rob Nelson Company. [*Id.*] ¶ 47. On or about September 3, 2014, The Rob Nelson Company transferred the "Big League" trademarks and related intellectual property rights to Big League Chew Properties. [*Id.*] ¶ 48.

On July 16, 2010, The Rob Nelson Company entered into a License Agreement with Defendant Ford Gum & Machine Company Inc., which was subsequently amended by a 2012 first amendment, a 2014 second amendment, and a 2019 third amendment. [1] ¶ 55; [1-1]. Under the License Agreement, defendant has the exclusive right to manufacture, market, and sell products in connection with the Big League Chew mark, including shredded gum. In 2022 and 2024, defendant extended multiple proposals to acquire plaintiffs or certain of plaintiffs' assets. [23] 23–24; [1-5]. As relevant to the instant motions, on March 26, 2024, President and CEO of Ford Gum, Scott Lerner, sent Nelson an email stating the following:

> Considering the recent discovery of a potential competitive product to Big League Chew, Ford Gum would like to file for a trade dress on the product form of "shredded gum". Once we due [sic] this we would like to send a cease-and-desist letter to Hilco. I am seeking your approval for us to take this action on behalf of Ford Gum. If you want to discuss this live, I might suggest we set up a call for next week. Thanks.

[33-23] 2. That same day, Nelson responded with the following: "Scott - excellent idea. I approve." [*Id.*] On April 1, 2024, defendant filed U.S. Federal Trademark Application, Serial No. 98/478,576 with the United States Patent & Trademark Office (USPTO) to register trademark/trade dress rights in the shredded gum configuration, *i.e.*, "a three-dimensional configuration of the goods comprised of shreds or strings," with Ford Gum as the owner of the mark. [1-6]. On December 3, 2024, the USPTO

published the application for opposition. [23] 27. Plaintiffs' deadline to file opposition to the application was April 2, 2025. [63] 8.

On November 18, 2024, plaintiffs filed a complaint alleging claims of trade dress infringement (15 U.S.C. § 1125(a)), unfair competition and false designation of origin (§ 1125(a)), dilution (§ 1125(c)), state common law trademark and trade dress infringement, state common law trademark dilution, deceptive trade practices under 815 I.L.C.S. § 510, breach of the licensing agreement, and breach of the equipment purchase agreement. Also on November 18, 2024, plaintiffs filed their instant motion for preliminary injunction [7]. On December 11, 2024, defendant filed its answer and affirmative defenses, as well as brought counterclaims for declaratory judgments, specific performance (of the March 2024 "agreement"), and specific performance (of the License Agreement). [23] 101–05. The following day, defendant notified the Court that it also intended to file a motion for preliminary injunction and the parties jointly requested an evidentiary hearing on the motions [25]. On December 17, 2024, District Judge Valderrama set a briefing schedule on the parties' motions [26]. On December 20, 2024, defendant filed its motion for preliminary injunction [32].

This case was referred to Magistrate Judge McShain on January 7, 2025 for, in part, resolution of the parties' motions for preliminary injunctions [41, 42].[3] Both motions were fully briefed with the parties' respective replies on January 31, 2025. In a February 26, 2025 joint status report, defendant reiterated its request for an evidentiary hearing, but plaintiffs indicated that they no longer request an evidentiary hearing on either motion and that both motions can be decided based on the briefing and supporting exhibits. [63] 6–7. The parties provided approximately 84 supporting exhibits, including affidavits[4] from Rob Nelson, Scott Lerner, and Robert Spigner, Director of Form Gum. The undersigned determined that an evidentiary hearing was unnecessary[5] and provides this Report and Recommendation based on the papers. *See* 28 U.S.C. § 636(b)(1)(B).

## Legal Standard

"The purpose of a preliminary injunction is to minimize the hardship to the parties pending resolution of their lawsuit." *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474 (7th Cir. 2001). "A preliminary injunction is an extraordinary

---

[3] Northern District of Illinois Internal Operating Procedure 14 allows for the referral of motions for preliminary injunctions to magistrate judges for reports and recommendations.

[4] Affidavits are fully admissible in preliminary injunction proceedings. *Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, No. 20 C 2244, 2020 WL 6265133, at *1 (N.D. Ill. Aug. 20, 2020) (citing *Goodman v. Illinois Dep't of Fin. & Pro. Regul.*, 430 F.3d 432, 439 (7th Cir. 2005); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997)).

[5] The Court "need not conduct an evidentiary hearing 'unless one is called for as a result of a fact issue created by the response to a motion for a preliminary injunction.'" *Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, No. 20 C 2244, 2022 WL 1643817, at *1 (N.D. Ill. Mar. 25, 2022) (quoting *Dexia Crédit Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010)).

remedy never awarded as of right." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). It "is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Kellytoy Worldwide, Inc. v. Ty, Inc.*, No. 20 C 748, 2020 WL 5026255, at *2 (N.D. Ill. Aug. 25, 2020) (quoting *Orr*, 953 F.3d at 501). "Determination of whether a movant is entitled to a preliminary injunction involves a multi-step inquiry." *Int'l Ass'n of Fire Fighters, Local 365 v. City of East Chi.*, 56 F.4th 437, 446 (7th Cir. 2022). *See also Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) ("In our circuit, a district court engages in a two-step analysis to decide whether such relief is warranted."). First, parties "who seek a preliminary injunction must show that (1) they will suffer irreparable harm in the absence of an injunction, (2) traditional legal remedies are inadequate to remedy the harm, and (3) they have some likelihood of success on the merits." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021). "The two most important factors are likelihood of success on the merits and irreparable harm." *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 646 (7th Cir. 2024) (Jackson-Akiwumi, J., dissenting) (citing *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023)). If the movant makes this required threshold showing, "the court must then balance the harm the moving parties would suffer without an injunction against the harm the opposing parties would suffer if one is granted, and the court must consider the public interest, which takes into account the effects of a decision on non-parties." *Camelot Banquet Rooms, Inc.*, 14 F.4th at 628. "This balancing test is done on a sliding scale: 'If the [movant] is likely to win on the merits, the balance of harms need not weigh as heavily in his favor.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). "The party seeking a preliminary injunction bears the burden of showing that it is warranted." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023) (quoting *Speech First, Inc.*, 968 F.3d at 637).

## Discussion

## Plaintiffs' Motion for Preliminary Injunction

Plaintiffs seek a preliminary injunction prohibiting defendant from (1) marketing, advertising, or selling any goods containing shredded gum without Big League Chew's express permission; (2) holding itself out as the owner of any rights in shredded gum; and (3) violating the 2010 License Agreement with Big League Chew. [8] 1, 15.

## A.    Likelihood of Success on the Merits

"[A]n applicant for preliminary relief bears a significant burden, even though the Court recognizes that, at such a preliminary stage, the applicant need not show that it definitely will win the case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760,

763 (7th Cir. 2020). But showing a "better than negligible" chance is no longer enough; as the Seventh Circuit has reminded courts in this Circuit, that standard was retired by the Supreme Court. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Mays v. Dart*, 974 F.3d 810, 821–22 (7th Cir. 2020); *Pritzker*, 973 F.3d at 762–63. "The moving party's likelihood of prevailing on the merits must exceed 'a mere possibility of success.'" *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022) (quoting *Life Spine*, 8 F.4th at 540). *See also Bevis*, 85 F.4th at 1188 (citing the *Nken* case and noting that it is not enough that the chance of success on the merits be "better than negligible," nor is a mere possibility of success enough). In other words, "while a movant need not prove its claims at this stage by a preponderance of the evidence, it must demonstrate at a minimum how it proposes to prove the key elements of its case." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023) (citing *Pritzker*, 973 F.3d at 763). *See also K.C.*, 121 F.4th at 646 (stating that courts ask the movant to demonstrate how it proposes to prove the key elements of its case "and evaluate its chance of success based on this proffer").

In their motion, plaintiffs argue that there are two related grounds for granting the requested preliminary injunction against defendant: (1) defendant infringed on plaintiffs' protectable trade dress in shredded gum and (2) defendant breached the License Agreement, which entitles plaintiffs to injunctive relief by the agreement's terms. [8] 8.

### 1. Trade Dress Infringement

The complaint alleges that defendant intentionally infringed Big League Chew's trade dress "by, among other things, filing a trademark application with the [USPTO] and asserting ownership of, and attempting to register in its own name," the shredded gum configuration and distinctive product configuration. [1] ¶ 4. The complaint brings claims of trade dress infringement under 15 U.S.C. § 1125(a) and state common law trademark and trade dress infringement. [*Id.*] ¶¶ 158–69, 187–96. "[A]n Illinois common law claim for trademark infringement uses the 'same analysis' as a federal Lanham Act claim." *Am. Nat'l Ins. Co. v. Am. Nat'l Investment Advisors, LLC*, No. 11-cv-4016, 2014 WL 6613342, at *18 (N.D. Ill. Nov. 21, 2014) (citations omitted). *See Reddi Beverage Co. LLC v. Floral Beverages, LLC*, No. 23-cv-06147, 2023 WL 8827978, at *3 (N.D. Ill. Dec. 21, 2023) ("The elements of common law trademark infringement in Illinois generally mirror that of the Lanham Act.") (citing *Curry v. Revolution Lab'ys, LLC*, No. 17 C 2283, 2022 WL 225877, at *8 (N.D. Ill. Jan. 26, 2022)). "Common law and Lanham Act claims of trademark infringement for the same marks are thus resolved concurrently." *Am. Nat'l Ins. Co.*, 2014 WL 6613342, at *18 (citations omitted).

The protections of the Lanham Act extend to trade dress, "such as the design or packaging of a product that is so distinctive as to identify the manufacturer or source." *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 418 (7th Cir.

2017) (citing cases). *See Incredible Technologies, Inc. v. Virtual Technologies, Inc.*, 400 F.3d 1007, 1015 (7th Cir. 2005) ("The term trade dress refers to the 'appearance of a product when that appearance is used to identify the producer.'") (quoting *Publ'ns Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338 (7th Cir. 1998)).[6] The Court uses the terms interchangeably for ease of quoting case law without making unnecessary alterations, and any reference to "trademark" or "mark" applies to and encompasses "trade dress." "To prove trade dress infringement of unregistered trade dress, a plaintiff must establish: '(1) its trade dress is "inherently distinctive" or has acquired "secondary meaning"; (2) the similarity of the defendant's trade dress to that of the plaintiff creates a "likelihood of confusion" on the part of consumers; and (3) the plaintiff's trade dress is 'non-functional.'"" *Toyo Tire & Rubber Co., Ltd. v. Atturo Tire Corp.*, No. 14-cv-00206, 2019 WL 7020654, at *1 (N.D. Ill. Dec. 20, 2019) (quoting *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1068 (7th Cir. 1992)).[7] *See also* 15 U.S.C. § 1125(a)(3); *Arlington Specialties, Inc.*, 847 F.3d at 418 ("When the trade dress is unregistered . . . the party seeking protection has the burden to show it is not functional.").

---

[6] *See also Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 209–10 (2000); *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1067 (7th Cir. 1992); *Plum Markets, LLC v. Compass Grp. USA, Inc.*, No. 20 C 6759, 2021 WL 323791, at *2 (N.D. Ill. Feb. 1, 2021); *Specialized Seating, Inc. v. Greenwich Indus.*, L.P., 472 F.Supp.2d 999, 1010 (N.D. Ill. 2007).

[7] As noted, plaintiffs' complaint also alleges claims of unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), and deceptive trade practices under the Uniform Deceptive Trade Practices Act, 815 I.L.C.S. § 510. [1] ¶¶ 170–77, 204–11. Plaintiffs' motion for preliminary injunction focuses only on showing that plaintiffs are likely to succeed on the merits of their trade dress infringement claims. [8] 10. But the Court notes that nevertheless, "[t]he elements required to prove a UDTPA cause of action overlap with the elements of a Lanham Act claim: (1) that the petitioning party has a protectable trademark; and (2) that the defendant's use of the trademark is likely to cause confusion." *Brithric Enters., LLC v. Bay Equity LLC*, No. 20-cv-04696, 2021 WL 1208957, at *3 (N.D. Ill. Mar. 31, 2021) (citing *Holbrook Mfg LLC v. Rhyno Mfg. Inc.*, 497 F.Supp.3d 319, 332 (N.D. Ill. 2020)). *See also Specht v. Google, Inc.*, 660 F.Supp.2d 858, 866 (N.D. Ill. 2009) ("Illinois courts resolve DTPA claims arising out of an alleged infringement of a mark under the same standard as the Lanham Act."). The same is true of unfair competition and false designation of origin claims arising under the Lanham Act. *See George G, LLC v. George Charles Salon Inc.*, 2022 WL 823882, at *2–3 (N.D. Ill. Mar. 18, 2022) ("Because each cause of action alleged here requires the same elements of pleading, this Court will assess the viability of all counts as one."); *Long Grove Investments, LLC v. Baldi Candy Co.*, 397 F.Supp.3d 1190, 1197 (N.D. Ill. 2019) ("Section 43(a) claims proceeding under theories of 'false designation of origin' and 'unfair competition' mirror those for a trademark infringement claim."); *Slep-Tone Ent. Corp. v. Sellis Enters., Inc.*, 87 F.Supp.3d 897, 903 (N.D. Ill. 2015) ("[C]laims of trademark infringement and unfair competition under the Lanham Act based on the same conduct are evaluated under the same standard."); *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1012–13 (N.D. Ill. 2014) ("Each of the claims at issue in this motion involves the same elements and proofs. . . . both the Seventh Circuit and the Northern District of Illinois have interpreted claims of unfair competition brought under a trademark infringement theory to include the same elements of trademark infringement itself."); *Trans Union LLC v. Credit Research, Inc.*, 142 F.Supp.2d 1029, 1038 (N.D. Ill. 2001).

The parties do not dispute that the shredded gum configuration is a protectable form of trade dress. After all, defendant filed an application to register the subject trade dress and in its answer to the complaint, defendant agrees that the shredded gum trade dress is nonfunctional and distinctive. [23] 48, 55. Rather, both parties agree that the central issue in this case, and at the heart of the instant motion, is who owns the trade dress rights in the shredded gum configuration. [51] 2; [55] 2. Plaintiffs argue that they own the rights and defendant is a mere licensee that manufactures and sells shredded gum pursuant to the License Agreement. [8] 5–6; [55] 2. Defendant argues that it is the owner by means of the March 26, 2024 email exchange, which defendant refers to as the March 2024 Agreement. [51] 2.

### a. Ownership

"In determining whether a party has established rights in a trademark, [courts] take into account all relevant facts[.]" *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 665 (7th Cir. 2016). Plaintiffs have not registered or applied for registration of the shredded gum configuration with the USPTO. *See* [39] ¶¶ 29–30; [8-1] ¶ 15; [8-2] 22–23 (list of registered Big League Chew trademarks and pending applications). Rather, plaintiffs refer to having a common law trademark/trade dress ownership in the shredded gum configuration. [1] ¶¶ 33, 42, 72; [8-1] ¶¶ 15, 24, 54; [8-2] 22. "Under the Lanham Act, trademarks that are 'used in commerce' may be placed on the 'principal register,' that is, they may be federally registered." *Matal v. Tam*, 582 U.S. 218, 224–25 (2017) (quoting 15 U.S.C. § 1051(a)(1)). "Federal registration . . . 'confers important legal rights and benefits on trademark owners who register their marks.'" *Id.* at 226 (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015)). But registration of a mark or trade dress is not required. *Vidal v. Elster*, 602 U.S. 286, 291 (2024); *Iancu v. Brunetti*, 588 U.S. 388, 391 (2019). "Without federal registration, a valid trademark may still be used in commerce. . . . And an unregistered trademark can be enforced against would-be infringers in several ways. Most important, even if a trademark is not federally registered, it may still be enforceable under § 43(a) of the Lanham Act, which creates a federal cause of action for trademark infringement." *Matal*, 582 U.S. at 225.

"Ultimately, it is not the fact of registration that matters so much as the use of the mark in commerce[.]" *Cent. Mfg., Inc. v. Brett*, 492 F.3d 876, 881 (7th Cir. 2007). *See S.C. Johnson & Son*, 835 F.3d at 665 ("It is a bedrock principle of trademark law that trademark ownership is not acquired by federal or state registration, but rather from prior appropriation and actual use in the market.") (cleaned up); *Sands, Taylor & Wood Co. v. Quaker Oats, Co.*, 978 F.2d 947, 954 (7th Cir. 1992) (noting that "trademark rights derive from the use of a mark in commerce and not from mere registration of the mark"). "The party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it." *TWD, LLC v. Grunt Style LLC*, 598 F.Supp.3d 676, 688 (N.D. Ill. 2022) (quoting

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999)). *See Vidal*, 602 U.S. at 333 (Sotomayor, J., concurring) (stating that "by virtue of common law, the first person to use a distinct mark in commerce acquires rights to that mark, including exclusivity rights to prevent others from using the mark") (cleaned up); *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015) ("Rights in a trademark are determined by the date of the mark's first use in commerce. A party who first uses a mark in commerce is said to have priority over other users."); *Brithric Enters., LLC v. Bay Equity LLC*, No. 20-cv-04696, 2021 WL 1208957, at *4 (N.D. Ill. Mar. 31, 2021) ("Common law confers superior ownership rights on the party who first appropriates the mark through use.") (internal quotations omitted); *Medscript Pharmacy, LLC v. D&D Pharma LTC, LLC*, 444 F.Supp.3d 909, 914 (N.D. Ill. 2020) ("[U]se prior to registration creates priority."); *Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles*, No. 11 C 2569, 2012 WL 3686776, at *9 (N.D. Ill. Aug. 24, 2012) ("[I]n the absence of, or prior to, federal registration, whether a party has a protectable interest in a trademark is established by the first actual use of the mark in commerce."). Accordingly, a "trademark application is always subject to previously established common law trademark rights of another party." *Fabick, Inc. v. JFTCO, Inc.*, 944 F.3d 649, 656 (7th Cir. 2019) (quoting *S.C. Johnson & Son*, 835 F.3d at 665–66). *See Johnny Blastoff*, 188 F.3d at 435; *Oasis Legal Fin. Operating Co., LLC v. Chodes*, 454 F.Supp.3d 724, 737 (N.D. Ill. 2020).

"This 'use' must be 'continuous and bona fide,' and 'the mark must be attached to the product or service sold to the public.'" *Long Grove Investments, LLC v. Baldi Candy Co.*, 397 F.Supp.3d 1190, 1195 (N.D. Ill. 2019) (quoting *Specht v. Google Inc.*, 758 F. Supp. 2d 570, 588 (N.D. Ill. 2010)). *See also Brithric Enters.*, 2021 WL 1208957, at *4 (stating that "use" of a mark or trade dress "under the common law means that the mark was attached to the product or service sold to the public" and that "[s]uch use must also be continuous"); *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 879 (N.D. Ill. 1999) (same). "Ownership only inheres where a party's use of the mark is 'deliberate and continuous, not sporadic, casual or transitory.'" *Long Grove Investments*, 397 F.Supp.3d at 1195 (quoting *Google Inc.*, 758 F. Supp. 2d at 588). Here, plaintiffs have presented evidence showing that the first batch of "shredded gum in a stay fresh pouch" was created by Rob Nelson and first sold in commerce in 1979, that it achieved nationwide distribution by 1981, and that plaintiffs have continuously used the shredded gum product configuration since then. *See, e.g.*, [8] 2–4; [8-1] ¶¶ 3, 10, 12–13, 16, 19, 21, 47, 48, 68; [8-2] 3, 26–44, 53, 72. There is no dispute that plaintiffs have "used" the shredded gum configuration as trade dress in connection with their product sold to the public since 1979.[8] *See* [23]

---

[8] The declaration of defendant's CEO, Scott Lerner, attached to defendant's trademark registration application acknowledges and relies on this history: "Ford Gum and its predecessor-in-interest is the <u>first</u> company to offer and sell chewing gum (including bubble gum) in a shredded shape. Ford Gum began a selling [sic] its shredded gum Product in or about 1979. Since that time, and through the present, Ford Gum has been, and is, the <u>only</u> company to offer and sell gum in a shredded shape." [8-3] 30 (emphases in original). The "predecessor-in-interest" referred to in this declaration is "one or more of the Plaintiffs." [51] 10; [33-2] ¶ 59.

8

13 (defendant's answer agreeing that "one or more Plaintiffs, and/or their predecessors-in-interest continuously used and owned the 'Shredded Bubble Gum Trade Dress' from 1979 until July 16, 2010"). Nor was plaintiffs' continuous use of the trade dress interrupted by licensing the rights to manufacture, market, and sell licensed products in connection with plaintiffs' intellectual property to Ford Gum, as defendant seems to suggest. [51] 8 n.2 ("Ford Gum has owned the Shredded Gum Trade Dress since 2010."); [34] 9 (defendant's motion for preliminary injunction asserting that Big League Chew "hasn't used the Shredded Gum Trade Dress since at least July 2010"). An individual or entity "need not use the trademark through its own use to satisfy the 'use in commerce' requirement." *Slep-Tone Ent. Corp. v. Kalamata, Inc.*, 75 F.Supp.3d 898, 904 (N.D. Ill. 2014). Rather, "the law is clear that the 'use in commerce' requirement may be satisfied through use of the trademark by controlled licensees[.]" *Id.* at 905.

In short, the Court recommends that the District Judge find that plaintiffs have sufficiently demonstrated at this stage that despite the absence of federal registration, plaintiffs established "superior rights" through use of the shredded gum trade dress in commerce and as a "designation of source," and that plaintiffs have been using the shredded gum configuration in connection with their product since 1979. However, in opposing plaintiffs' motion for preliminary injunction, defendant argues that the entire motion fails and plaintiffs cannot show a likelihood of success on the merits because defendant is *now* the owner of the shredded gum trade dress through either assignment/transfer or abandonment, and because plaintiffs have not shown that defendant used the shredded gum trade dress in commerce without plaintiffs' authorization in violation of the Lanham Act. [51] 7–9, 11–14.

### b. Assignment/Acquiescence

Defendant's primary argument is that plaintiffs entered into an agreement transferring ownership of the rights in the shredded gum trade dress to defendant through two emails between defendant's CEO, Scott Lerner, and plaintiffs' president and owner, Rob Nelson, on March 26, 2024. [51] 2–3, 5–6, 8–9. Defendant refers to this email exchange as "the March 2024 Agreement." Specifically, defendant argues that plaintiffs "agreed in writing" that defendant should register the shredded gum trade dress at the USPTO and enforce it, that defendant performed the March 2024 Agreement, and that plaintiffs benefitted from defendant's performance because defendant's enforcement efforts protect and preserve royalty payments made to plaintiffs. [*Id.*] 2–3 (citing [33-2] ¶¶ 15–17; [33-23]; [35] ¶¶ 44–49). And defendant asserts that plaintiffs affirmed this agreement in a September 2024 text message sent by Nelson. [*Id.*] 2, 3, 6, 8. *See* [23] 65 (aligning with the arguments made in defendant's third affirmative defense of plaintiffs' waiver of ownership). Defendant argues that based on this March 2024 Agreement, plaintiffs are not likely to succeed on the merits and "all of their claims of ownership will fail." [51] 3. Plaintiffs disagree with defendant's position that this email exchange constitutes a contract by which

9

plaintiffs surrendered the shredded gum trade dress rights to defendant, arguing that the emails do not contain any material terms such as consideration, assignment, or transfer of ownership of any intellectual property rights to defendant. [55] 6.

"[I]n trademark cases, 'acquiescence or permission is an affirmative defense,' shifting the burden of proof to the party raising the defense." *World Championship Wrestling, Inc. v. GJS Int'l, Inc.*, 13 F.Supp.2d 725, 733–34 (N.D. Ill. 1998) (citations omitted). And "under Illinois law, 'a party seeking to enforce an agreement has the burden of establishing the existence of the agreement.'" *Id.* at 734 (quoting *Reese v. Forsythe Mergers Grp., Inc.*, 682 N.E.2d 208, 213 (Ill. App. Ct. 1997)). As this dispute is the backbone of defendant's motion for preliminary injunction, the Court thoroughly evaluates whether defendant has shown that the March 2024 Agreement constitutes a valid and enforceable contract transferring trade dress rights in the shredded gum configuration in addressing defendant's motion. For the purposes of plaintiffs' motion, as explained in more detail below, the Court recommends that the District Judge find that defendant has not shown that the March 26, 2024 email exchange created a valid and enforceable contract transferring plaintiffs' common law rights in the shredded gum trade dress. Accordingly, the Court recommends that the District Judge find that this argument is insufficient to undermine or weaken the plausibility of plaintiffs' trade dress infringement claims for purposes of a preliminary injunction.

Aside from the argument that plaintiffs explicitly relinquished their rights to the shredded gum trade dress through the March 2024 Agreement, defendant's opposition also suggests that plaintiffs' actions, including through the March 2024 Agreement, show that plaintiffs impliedly consented to defendant's ownership of the shredded gum trade dress. Defendant asserts that plaintiffs informed defendant of an infringer on July 31, 2024, "so that Ford Gum would take enforcement action, consistent with the March 2024 Agreement." [51] 6, 8 (citing [33-2] ¶ 26; [33-25]). And defendant argues that plaintiffs "expressly confirmed" the March 2024 Agreement through a September 13, 2024 text Nelson sent to Lerner "confirming that he was 'good with' the March 2024 Agreement and that 'Ford Gum will own the trade dress.'" [*Id.*] (citing [33-2] ¶ 49; [33-28]). These arguments echo the assertions made in defendant's fourth affirmative defense of acquiescence.[9] [23] 65–66.

---

[9] *See* [23] 65–66 ("By entering into the March 2024 Agreement for Ford Gum to own, apply for, enforce, and pay for the Shredded Gum Trade Dress, and by reaping the benefits of Ford Gum's full and continuous performance of the March 2024 Agreement, Plaintiffs, and each of them, acquiesced to Ford Gum's ownership of the Shredded Gum Trade Dress. Plaintiffs affirmed their acquiescence by performing the March 2024 Agreement. Plaintiffs' performance consisted of, at least, providing to Ford Gum on July 31, 2024 evidence of an infringement of the Shredded Gum Trade Dress so that Ford Gum would enforce the Shredded Gum Trade Dress against that infringer, which Ford Gum proceeded to do. Plaintiffs reaffirmed their acquiescence to Ford Gum's ownership of the Shredded Gum Trade Dress in text messages Rob Nelson sent to Scott Lerner on September 13, 2024.").

The doctrine of acquiescence is "a fact-sensitive equitable defense that may estop a trademark owner from obtaining injunctive and monetary remedies for trademark infringement." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). *See also Bobak Sausage Co. v. A&J Seven Bridges, Inc.*, 805 F.Supp.2d 503, 513 (N.D. Ill. 2011) (explaining that "an acquiescence defense ordinarily estops a senior user from asserting rights against a party for the use of the mark to which the senior user consented"). "Acquiescence arises as a defense to trademark infringement in 'cases where the trademark owner, by affirmative word or deed, conveys its implied consent to another.'" *Trans Union LLC v. Credit Research, Inc.*, 142 F.Supp.2d 1029, 1041 (N.D. Ill. 2001) (quoting *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d at 885 (7th Cir. 1997)). Acquiescence is related to the doctrine of laches, and "although our cases sometimes blend the" two, "they are formally distinct and should be analyzed separately." *Hyson USA*, 821 F.3d at 940. *See id.* (noting that these are two separate categories of estoppel, that "laches is a negligent, unintentional failure to protect trademark rights," and that acquiescence "is associated with intentional abandonment"). Acquiescence requires a defendant establish "three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) the [senior user's] delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Id.* at 941 (alteration in original) (internal quotations omitted). "A trademark owner can convey an active representation through its 'words or conduct.'" *Chi. Mercantile Exch. Inc. v. ICE Clear US, Inc.*, No. 18 C 1376, 2020 WL 1905760, at \*5 (N.D. Ill. Apr. 17, 2020) (quoting *Hyson USA, Inc.*, 821 F.3d at 940). *See also Bobak Sausage Co.*, 805 F.Supp.2d at 513 ("Active consent is implied by conduct on the plaintiff's part that amounts to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant.") (citing *ProFitness Physical Therapy Ctr. v. Pro–Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002)).

Defendant's opposition brief does not engage in this specific analysis and does not evaluate the second or third factors at all. Regardless, these "two elements of the defense—delay and undue prejudice—cannot alone support a finding of acquiescence," *Hyson USA, Inc.*, 821 F.3d at 941, and the evidence defendant relies on does not amount to plaintiffs "actively representing" that they would not assert their rights against defendant. *See, e.g., Hyson USA, Inc.*, 821 F.3d at 941; *Chodes*, 454 F.Supp.3d at 738.[10] As to the March 2024 Agreement, Lerner's March 26, 2024 "offer email" did not include any suggestion that plaintiffs would represent that they

---

[10] Even if defendant's opposition sufficiently demonstrated acquiescence, "the defense of acquiescence is not absolute. Upon a showing that 'inevitable confusion' arises from the continued dual use of the marks, a senior user's claim may be revived." *Bobak Sausage Co.*, 805 F.Supp.2d at 513 (citing *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996)). Plaintiffs' motion and reply brief address "likelihood of confusion" but not "inevitable confusion," which are two different standards. *See, e.g., TMT N. Am., Inc.*, 124 F.3d at 886 ("'Inevitable confusion' is 'an increment higher than that required for a finding of likelihood of confusion.'") (quoting *SunAmerica Corp.*, 77 F.3d at 1334 n.3).

would not assert a right or claim in the shredded gum trade dress, and Nelson's response email that defendant asserts constitutes acceptance merely stated, "Scott - excellent idea. I approve." [33-23] 2. These two brief lines do not demonstrate an "active representation" that plaintiffs would not assert a right or claim regarding the shredded gum trade dress. Nor does Nelson's September 2024 text amount to the requisite "active representation." Defendant selectively points to the words "Ford Gum will own the trade dress" in Nelson's text, [51] 2, 6, but the full quote is as follows: "It does seem odd that Ford Gum will own the trade dress protection and not I, but since it is likely that you guys will eventually own all the Big League Chew trademarks anyway, the idea does make sense." [33-28] 2. In the same message, Nelson also stated that he is "willing to contribute to the expense that was required to acquire this protection" and that "[t]he goal has been to hold onto my Big League Chew stuff until BLC's 50th anniversary, but I am willing to listen to any new ideas Ford Gum has sooner than that." [*Id.*] These statements do not support an "active representation" that plaintiffs would not assert a right or a claim in the shredded gum trade dress. Finally, plaintiffs point to a July 31, 2024 text from Nelson to Lerner that defendant characterizes as informing defendant of an infringer "so that Ford Gum would take enforcement action, consistent with the March 2024 Agreement." [51] 6 (citing [33-2] ¶ 26; [33-25]). The provided screenshots merely show Nelson texted a picture of a third party's shredded gum product to Lerner and stated, "So lame." [33-26] 2. Based on the screenshots before the Court, it was Lerner who introduced then the subject of taking enforcement action, stating "[w]e will be sending them a cease and desist" and "[w]e are on it." [*Id.*] 3. Without more, the Court cannot find that this is evidence of an "active representation" by plaintiffs that they have no right or claim to the shredded gum trade dress. Even considering these three examples in combination does not rise to the level of demonstrating plaintiffs' "active representation" that they would not assert a right or a claim in the shredded gum trade dress.

For these reasons, the Court recommends that the District Judge find that any implied consent/acquiescence argument is insufficient to undermine the plausibility of plaintiffs' trade dress infringement allegations for purposes of a preliminary injunction.

### c. Abandonment

Defendant's opposition also argues that plaintiffs have "purposefully disavowed" shredded gum trade dress rights. [51] 4–5. Defendant criticizes plaintiffs for failing to apply for trade dress registration and enforce trade dress rights against infringers, asserting that "[f]or decades, Plaintiffs intentionally failed to claim ownership of the Shredded Gum Trade Dress, register it with the USPTO, enforce it against infringers and/or, include it in the License Agreement." [*Id.*] 4–5, 8. *See also* [*id.*] 4–5 ("Plaintiffs' own evidence also shows that they never enforced against infringements of any Shredded Gum Trade Dress, even though they knew about other

brands that previously sold shredded gum."); [34] 9 (defendant's motion for preliminary injunction raising these points). Defendant provides an example of a third party's intent to sell a shredded gum product in February 2024 and plaintiffs' "disinterested" response: "Let's have at it vs. the wannabes." [51] 5 (citing [35] ¶ 34; [33-21]; [33-22] 3).

Although defendant's opposition brief never uses the word "abandonment," these arguments echo those raised in defendant's sixth affirmative defense asserting abandonment. *See* [23] 66–67. "In both federal and common law, the holder of an abandoned mark relinquishes all rights to the exclusive use and ownership of the mark where abandonment is found." *Am. Nat'l Ins. Co.*, 2014 WL 6613342, at *7. "Once a mark is abandoned, it returns to the public domain, and may be appropriated anew." *Specht v. Google Inc.*, 747 F.3d 929, 935 (7th Cir. 2014). *See Rust Env't & Infrastructure v. Teunissen*, 131 F.3d 1210, 1215 (7th Cir. 1997) (finding that use of an abandoned mark does not violate the Lanham Act); *Google Inc.*, 758 F.Supp.2d at 585 ("If Google's use of the ANDROID mark commenced after Plaintiffs abandoned their mark, their use would not constitute trademark infringement."). As an affirmative defense, "[t]he burden for proving abandonment falls on" defendant. *Miyano Machinery USA, Inc. v. MiyanoHitec Machinery, Inc.*, 576 F.Supp.2d 868, 880 (N.D. Ill. 2008); *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 935 (7th Cir. 1989). *See also Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *10 (N.D. Ill. June 10, 2015). This is typically a high hurdle; "because abandonment 'results in a forfeiture of rights, the courts are reluctant to find an abandonment.'" *Am. Nat'l Ins. Co.*, 2014 WL 6613342, at *7 (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:12).

First, as previously emphasized, federal registration of a trademark or trade dress is not mandatory. *Vidal*, 602 U.S. at 291; *Iancu*, 588 U.S. at 391. Registration creates a presumption of validity, but the Lanham Act protects both registered *and* unregistered trademarks and trade dress. *Matal*, 582 U.S. at 225; 15 U.S.C. §§ 1115, 1125. Failure to register with the USPTO is not considered abandonment and defendant provides no case law to suggest that choosing not to apply for registration is a purposeful "disavowal" of any rights.[11] "Whether a mark is abandoned . . . depends on how the mark is used, rather than whether it is registered." *C&N Corp. v. Kane*, 953 F.Supp.2d 903, 912 (E.D. Wis. 2013) (citing *Sands, Taylor & Wood Co.*, 978 F.2d at 954–55).

---

[11] Although not the factual circumstances of this case, even abandoning a pending application for registration of a trademark or trade dress is not considered evidence of abandonment of the rights to that trademark/trade dress. "Abandonment of an application for registration does not constitute abandonment of ownership of trademark." *TWD, LLC v. Grunt Style LLC*, No. 18 C 7695, 2020 WL 5415658, at *1 (N.D. Ill. Jan. 16, 2020) (quoting *Hipple v. Hipple*, No. 12-1256, 2017 WL 6450556, at *3 (E.D. Pa. Dec. 18, 2017)). *See also C&N Corp. v. Kane*, 953 F.Supp.2d 903, 913 (E.D. Wis. 2013) (pointing out that under 37 C.F.R. § 2.68, "the fact that a federal trademark application has been abandoned has no affect [sic] on the common law rights in the mark").

Second, defendant provides no case law in support of the suggestion that non-enforcement of trademark or trade dress rights against third-party infringers diminishes claims of ownership or results in the loss of those rights.[12] Rather, a trademark is considered "abandoned if its 'use in commerce' has been discontinued with no intent to resume use." *Specht*, 747 F.3d at 934 (citing 15 U.S.C. § 1127; *Teunissen*, 131 F.3d at 1214). *See Sands, Taylor & Wood Co.*, 978 F.2d at 954–55 (stating that "the owner of a mark will lose his exclusive rights if he fails actually to use it"); *Am. Nat'l Ins. Co.*, 2014 WL 6613342, at *7 ("Abandonment thus depends on two key elements: lack of use, and intent not to resume use."); *Trans Union LLC*, 142 F.Supp.2d at 1040 (stating that "[a]bandonment requires intentional non-use of a trademark"). There is nothing in the record before the Court to indicate intentional abandonment, and defendant does not demonstrate that plaintiffs have discontinued the use of shredded gum in commerce with no intent to resume use. The closest defendant's opposition brief comes is a footnote that recognizes, when convenient to defendant, that "trademark rights derive from use." [51] 8 n.2. Defendant asserts that "[s]ince 2010, Ford Gum has been the only company with the equipment to make gum in the shape of the Shredded Gum Trade Dress and has been the one using the trade dress." [*Id.*] Based on this, defendant argues that "Ford Gum has owned the Shredded Gum Trade Dress since 2010." [*Id.*] Such a claim completely ignores that plaintiffs did not sell, transfer, or otherwise assign any rights to defendant in 2010, but rather entered into a licensing agreement and an equipment lease agreement. Ownership rights in a trademark "can be acquired *and maintained* through the use of the mark by a controlled licensee . . . ." *Ty, Inc. v. Publ'ns Int'l, Ltd.*, No. 99 C 5565, 2005 WL 464688, at *2 (N.D. Ill. Feb. 25, 2005) (emphasis added) (quoting 4 McCarthy, *supra*, § 18:46). *See also Slep-Tone Ent. Corp. v. Coyne*, No. 13 C 2298, 2015 WL 127836, at *3 (N.D. Ill. Jan. 8, 2015) (collecting cases). Entering into a licensing agreement therefore does not constitute an "intentional non-use of a trademark" or result in "relinquishment of the trademark rights against the world." *Trans Union LLC*, 142 F.Supp.2d at 1040. "A licensee's use of a mark inures to the benefit of the licensor,

---

[12] Perhaps defendant is thinking of the doctrine of laches, which is a defense "derived from the maxim that those who sleep on their rights, lose them." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002) (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999)). *See Hot Wax, Inc.*, 191 F.3d at 820 ("Laches addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it."); *Nat'l Council of U.S. Soc'y of St. Vincent de Paul, Inc. v. St. Vincent de Paul Cmty. Ctr. of Portage Cnty., Inc.*, No. 16-cv-423, 2017 WL 6759411, at *11 (W.D. Wis. Dec. 29, 2017) ("Fundamentally, the concept of laches concerns whether it is fair for the plaintiff to assert a legal claim."). "The Lanham Act specifically contemplates that both injunctive relief and awards of damages for violations of 15 U.S.C. § 1125 shall be subject to the principles of equity, which include the doctrine of laches." *Id.* at 822. The Court is not quite convinced that the doctrine of laches applies to the specific circumstances of this case. But more significantly, neither defendant's opposition nor affirmative defenses and counterclaims, or even defendant's motion for preliminary injunction, raises a laches defense. As an affirmative defense, defendant bears the burden. *Chattanoga Mfg.*, 301 F.3d at 792; *C&N Corp.*, 953 F.Supp.2d at 911. And it is not for the Court to "research and construct the legal arguments open to parties, especially when they are represented by counsel." *Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) (quoting *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988)).

and the licensee acquires no ownership rights in the mark itself." *Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.*, Nos. 99 C 7778, 99 C 7822, 2003 WL 23144859, at *10 (N.D. Ill. Dec. 22, 2003) (citing *Gorenstein Enters., Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989); *Smith v. Dental Prods. Co.*, 140 F.2d 140, 148 (7th Cir. 1944)). *See also A&L Indus., LLC v. Weaver Enters., Ltd.*, No. 20-cv-552, 2021 WL 3856745, at *7 (W.D. Wis. Aug. 30, 2021) (same). Defendant's brief recognizes this principle elsewhere, asserting that defendant only used the trade dress and manufactured shredded gum "with plaintiffs' consent" and with "plaintiffs' authorization." [51] 11.

Although defendant does not raise this point, the Court does note that it is possible for a trademark owner to involuntarily "abandon all trademark rights through uncontrolled or 'naked' licensing." *TMT N. Am.*, 124 F.3d at 885. A failure to raise or develop an argument waives it, but for the sake of completeness, the Court briefly addresses this theory. "[N]aked licensing arises not when unlicensed users infringe a trademark but rather when the trademark owner fails to properly supervise the use of the mark by licensees." *Chi. Mercantile Exch. Inc. v. ICE Clear US, Inc.*, No. 18 C 1376, 2019 WL 414663, at *2 (N.D. Ill. Feb. 1, 2019) (citing *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788 (7th Cir. 2011)). *See also Specht*, 747 F.3d at 935 (noting that "an argument about naked licensing is an argument about [an owner's] rights against licensees"). "When a trademark holder licenses its mark to a third party, it has a duty to control the quality of the trademarked goods or services." *Geneva Int'l Corp. v. Petrof, Spol, S.R.O.*, 608 F.Supp.2d 993, 1003–04 (N.D. Ill. 2009) (citing *Gorenstein Enterprises*, 874 F.2d at 435). *See also In re XMH Corp.*, 647 F.3d 690, 697 (7th Cir. 2011) ("Trademark law requires that decision-making authority over quality remains with the owner of the mark.") (internal quotations omitted); *AmCan Enters., Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994) (stating that "the owner of a trademark is allowed to license its use, provided that it takes effective steps to ensure that the product sold by the licensee is of the same quality as the product sold by the licensor under the same name"). If a trademark owner fails to "maintain 'reasonable control' over product quality" and allows licensees "to depart from its quality standards," then "the public will be misled, and the trademark will cease to have utility as an informational device." *Nat'l Fin. Partners*, 2015 WL 3633987, at *10 (quoting *TMT N. Am.*, 124 F.3d at 885). A trademark owner, for example, "might delegate so much responsibility to the service provider as to lose the right or power to assure the quality of the trademarked brand, and then he would lose the trademark[.]" *In re XMH Corp.*, 647 F.3d at 697. *See also Renzi*, 32 F.3d at 235 ("If the licensor does not maintain adequate quality control, the mark may be deemed abandoned, or, equivalently, the licensor may be estopped to complain about infringements of it."). However, "[a]bsent a significant deviation from the licensor's quality standards, a licensor does not forfeit its trademark rights through licensing agreements." *TMT N. Am.*, 124 F.3d at 886. *See Geneva Int'l Corp.*, 608 F.Supp.2d at 1004 ("As long as the licensor maintains 'reasonable control' over the product's quality, however, it does not forfeit its trademark rights through

15

licensing agreements."). "The Seventh Circuit applies 'a flexible approach but allows licensors to rely at least somewhat on the reputation and expertise of licensees.'" *Nat'l Fin. Partners Corp.*, 2015 WL 3633987, at *10 (quoting *TMT N. Am.*, 124 F.3d at 885).

As the one asserting the defense, defendant would bear a "heavy burden" of "asserting a lack of reasonable control by a licensor." *Id.* (quoting *TMT N. Am.*, 124 F.3d at 885*). See also Nat'l Council of U.S. Soc'y of St. Vincent de Paul, Inc. v. St. Vincent de Paul Cmty. Ctr. of Portage Cnty., Inc.*, No. 16-cv-423, 2017 WL 6759411, at *14 (W.D. Wis. Dec. 29, 2017) (stating that because "a finding of inadequate control can result in a forfeiture of trademark rights, courts impose a heavy burden on the person asserting a lack of reasonable control by a licensor"); *Slep-Tone Ent. Corp. v. Coyne*, 141 F.Supp.3d 813, 823 (N.D. Ill. 2015) ("A party claiming that a trademark holder has engaged in naked licensing faces a heavy burden."). Defendant's opposition to plaintiffs' motion cannot be read as meeting that burden. Defendant does not raise any argument or point to any evidence showing that plaintiffs have failed to "maintain adequate quality control" or that there has been a "significant deviation" from plaintiffs' quality standards warranting a finding that plaintiffs abandoned or forfeited their trademark/trade dress rights through the License Agreement.

For these reasons, the Court recommends that the District Judge find that any abandonment argument is insufficient to undermine the plausibility of plaintiffs' trade dress infringement claims.

\* \* \* \* \* \*

Based on the foregoing, the Court recommends that the District Judge find that plaintiffs have demonstrated a likelihood of success on the merits regarding whether they have a valid and enforceable right in the shredded gum trade dress. However, defendant also argues that plaintiffs cannot show likelihood of success on the merits for their Lanham Act claims because (1) plaintiffs have not shown that defendant used the shredded gum configuration without plaintiffs' consent and (2) there is no likelihood of confusion.[13] [51] 11–12. The Court turns to what the Court identifies as the salient question arising from these arguments: whether plaintiffs have alleged an infringing use of the shredded gum trade dress in commerce under the Lanham Act.

### d.    Alleging an Actual Violation of the Lanham Act

Defendant argues that plaintiffs' claims all relate to defendant's claim of *ownership* over the shredded gum trade dress but that plaintiffs do not allege that defendant *manufactured or otherwise used* any shredded gum without plaintiffs'

---

[13] Because the Court recommends that the District Judge find that plaintiff has not demonstrated an unauthorized "use in commerce" under the Lanham Act, the Court does not reach the likelihood of confusion analysis.

authorization. [51] 11. Defendant argues that for this reason alone, plaintiffs' Lanham Act claims must fail. [*Id.*] In support, defendant cites *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412, 412 (2023) for the proposition that "[t]o prevail on a Lanham Act claim, Plaintiffs must demonstrate that Ford Gum's **use** of the Shredded Gum Trade Dress was **unauthorized**." [*Id.*] (emphasis in original). Defendant focuses on manufacturing as the only form of "use" of the trade dress, asserting that defendant has not manufactured any shredded gum without plaintiffs' authorization and has paid royalties to plaintiff for every unit of shredded gum product defendant has sold. [*Id.*] (citing [35] ¶¶ 69, 75, 141, 184).

Plaintiffs allege that defendant is infringing plaintiffs' trade dress rights "by fraudulently claiming the concept of shredded bubble gum as its own." [8] 10. Plaintiffs assert that defendant did not have plaintiffs' "permission to register a trademark in shredded bubble gum in Ford Gum's name or otherwise lay claim to [plaintiffs'] intellectual property." [8] 7 (citing [8-1] ¶¶ 93–94, 97, 103). Specifically, plaintiffs challenge defendant's filing of an application for registration of the shredded gum trade dress in defendant's name and defendant's public proclamations through the USPTO application and on its website ("fordgum.com")[14] that defendant owns the shredded gum trade dress. [8] 10; [55] 3, 8. *See* [55] 7 (arguing that defendant "has no right to assert ownership of the Shredded Gum Trade Dress and its unauthorized assertion of such a right to the public (in a sworn statement to a federal agency, and on its, and BLC's, websites) constitutes infringement, a breach of the License Agreement, and willful, malicious and deliberate acts of unfair competition"). Plaintiffs argue that defendant's "public proclamations are likely to cause confusion, mistake, and deception in violation of the Lanham Act" and therefore constitute infringement. [*Id.*] 8.

The Court is not satisfied with either party's briefing on what the Court sees as the threshold issue here. Defendant focuses on the "unauthorized" component of an infringement claim and only considers a form of "use" as "manufacturing." Plaintiffs argue the unauthorized "use" is defendant's filing of the registration application in its name and holding itself out as the owner of the shredded gum trade dress to the public. Both parties fail to explore what initially concerns the Court: is the act of filing for trade dress registration alone an infringing "use in commerce" under the Lanham Act? Or is the mere act of filing for registration a precursor to bona fide use in commerce such that to claim infringement at that point is premature?

---

[14] Plaintiffs' reply brief also includes an allegation that defendant holds itself out as the owner of the shredded gum trade dress in multiple instances on the website "bigleaguechew.com." [55] 3. *See also* [*id.*] 7 (challenging defendant's unauthorized assertion of ownership "to the public (in a sworn statement to a federal agency, and on its, *and BLC's, websites*)") (emphasis added). However, Nelson's declaration states that "www.bigleaguechew.com" is the website owned by Big League Chew. [8-1] ¶ 17. And plaintiffs provide no screenshots of the "bigleaguechew.com" website or examples of how defendant improperly holds itself out as the owner of the shredded gum trade dress on that website. Regardless, "arguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." *White*, 8 F.4th at 552–53.

"The Lanham Act requires that a mark be 'use[d] in commerce' for trademark counterfeiting and infringement, false designation of origin, and trademark dilution claims." *Shenzhen Kangmingcheng Tech. Co., Ltd. v. PDD Holdings, Inc.*, No. 23-CV-02697, 2024 WL 5221272, at *2 (N.D. Ill. Dec. 23, 2024) (alteration in original) (citing 15 U.S.C. §§ 1114, 1125(a), 1125(c)). *See Cognitest Corp. v. Riverside Publ'g. Co.*, No. 94 C 4741, 1995 WL 382984, at *3 (N.D. Ill. June 22, 1995) ("The complaint thus does not contain any allegations that the defendant's product was ever used in commerce, as required by the Lanham Act."). The Act provides a definition of "use in commerce":

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--
>
> > (1) on goods when--
> >
> > > (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
> > >
> > > (B) the goods are sold or transported in commerce, and
> >
> > (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127. "The Supreme Court has held that the term 'use in commerce' should be construed broadly [i]n the light of the broad jurisdictional grant in the Lanham Act." *MaiBo v. WhaleCo, Inc.*, No. 23 C 2793, 2024 WL 1859730, at *2 (N.D. Ill. Apr. 29, 2024) (alteration in original) (internal quotations omitted) (quoting *Slep-Tone Ent. Corp. v. Coyne*, 41 F. Supp. 3d 707, 713 (N.D. Ill. 2014)). *See also Steele v. Bulova Watch Co.*, 344 U.S. 280, 286 (1952); *Scotch Whiskey Ass'n v. Barton Distilling Co.*, 489 F.2d 809, 812 (7th Cir. 1973); *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co., Ltd.*, 191 F.Supp.3d 790, 805 (N.D. Ill. 2016).

Based on a plain reading, the mere act of filing an application with the USPTO to register the trade dress in defendant's own name does not seem to meet the Lanham Act's definition of "use in commerce." Neither party offers, and the Court's own research has not revealed, any case law directly on this point. On the other hand, courts have seemingly embraced a broad reading that "use in commerce" can encompass an "imminent" or "impending" infringement: "Both *AARP* and *JGX* suggest that a plaintiff may sue when a defendant's infringing use of the mark is imminent, not when the plaintiff has any reason whatsoever to believe an infringing use could occur at some uncertain time in the future." *VitalGo, Inc. v. Kreg Therapeutics, Inc.*, 370 F.Supp.3d 873, 885 (N.D. Ill. 2019) (citing *AARP v. 200 Kelsey Assocs., LLC*, No. 06 Civ. 81, 2009 WL 47499 (S.D.N.Y. Jan. 8, 2009); *JGX, Inc. v. Handlery*, No. 17-cv-00287, 2018 WL 984856, at *4–5 (N.D. Cal. Feb. 20, 2018)). *See also Maritz, Inc. v. Cybergold, Inc.*, 947 F.Supp. 1328, 1335 (E.D. Miss. 1996) ("A Lanham Act claim can exist even before a defendant actually opens the business, so long as the acts of defendant are imminent and impending."). And whether an infringing use is "imminent" or "impending" would appear to be a fact-specific question dependent on the circumstances of each case and whether a defendant has "taken concrete steps to actually use the marks at issue in commerce." *See, e.g.*, *VitalGo, Inc.*, 370 F.Supp.3d at 885 ("Knowledge that another is trying to develop a competing product does not mean that an intellectual property violation is 'imminent and impending.'").

But for the purpose of this Report and Recommendation, the Court need not make any conclusions or venture further down this rabbit hole. What does matter is that on a motion for preliminary injunction, the movant bears the "significant burden" of establishing a likelihood of success on the merits and "demonstrat[ing] at a minimum how it proposes to prove the key elements of its case." *Pritzker*, 973 F.3d at 763; *Grubhub Inc.*, 80 F.4th at 844; *K.C.*, 121 F.4th at 646. A key element of alleging a claim of trademark infringement is that the infringing mark or trade dress be "used in commerce," and the Court recommends that the District Judge find that plaintiffs' motion does not sufficiently argue or establish that the act of filing an application for registration with the USPTO is an infringing "use in commerce."

Plaintiffs also allege that an infringing act is defendant holding itself out as the owner of the shredded gum configuration to the public. Plaintiffs assert that "Ford Gum operates a website, www.fordgum.com, in which it falsely holds itself out as BIG LEAGUE CHEW and the owner of BIG LEAGUE CHEW's trademarks, and also falsely claims that BIG LEAGUE CHEW products are its own." [8] 7 (citing [8-1] ¶¶ 83–85). *See* [1] ¶ 103 (plaintiffs' complaint alleging that defendant's website "holds out the Big League Chew® registered trademarks as those of Ford Gum"); [1-7] (screenshots of defendant's website ("fordgum.com") attached to the complaint). In their reply brief, plaintiffs reassert that defendant "proclaims on its publicly available website, at the point of sale, that it owns the Shredded Gum Trade Dress and is the source of the shredded gum product being sold" and that such "proclamations are

likely to cause confusion, mistake, and deception in violation of the Lanham Act and, therefore, constitute infringement." [55] 8. The Court notes that defendant's opposition does not specifically mention or make any argument involving plaintiffs' claims as to "public proclamations" on defendant's website.

Unlike the act of filing an application for registration with the USPTO, it is well established that use of a trademark in connection with the Internet, such as a website that bears a trademark, may constitute a bona fide "use in commerce." *See, e.g.*, *S.C. Johnson & Son*, 835 F.3d at 666; *Specht*, 747 F.3d at 934–35; *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F.Supp.2d 824, 831–32 (N.D. Ill. 2000). Furthermore, "[a] wide variety of sources may demonstrate 'use' sufficient for public identification of a mark, including" advertising materials. *S.C. Johnson & Son*, 835 F.3d at 666 (citing *Johnny Blastoff*, 188 F.3d at 434). *See also Slep-Tone Ent. Corp. v. Sellis Enters., Inc.*, 87 F.Supp.3d 897, 906–07 (N.D. Ill. 2015) (citing 15 U.S.C. § 1127 and stating that "the use-in-commerce element is satisfied if a defendant uses a plaintiff's mark for the purpose of providing a service"). "So long as the trademarked goods or services are actually provided through or in connection with it, 'a website that bears a trademark may constitute a *bona fide* use in commerce.'" *S.C. Johnson & Son*, 835 F.3d at 666 (quoting *Specht*, 747 F.3d at 934–35). However, the Court is not satisfied that plaintiffs have sufficiently demonstrated how they propose to prove that defendant's website holds defendant out as Big League Chew and proclaims that defendant is the owner of the Big League Chew trademarks, the shredded gum trade dress, and the Big League Chew products.

In support of their argument that such "public proclamations" of ownership constitute infringement, plaintiffs rely on Nelson's declaration in which he asserts that the fordgum.com website "uses Big League Chew® intellectual property, including the Licensed Product, to promote BIG LEAGUE CHEW products as those of Ford Gum" and "holds out the Big League Chew® registered trademarks as those of Ford Gum."[15] [8-1] ¶¶ 83–85. Plaintiffs also provide screenshots from pages on the "fordgum.com" website. [8-3] 47–59. However, plaintiffs offer no additional explanation or more fully develop this argument. In an "About Us" section, defendant's website does state, "Today, we're the people behind Big League Chew® and *a leading co-manufacturer* for all kinds of gum." [8-3] 54 (emphasis added). But later on that page, in exploring Ford Gum's history, the website indicates that in 2010, "Ford Gum joined forces with Big League Chew®[.]" [*Id.*] 57. Defendant's website also states, "We *manufacture* the #1 shredded bubble gum . . ." and includes a link to the Big League Chew website. [8-3] 51 (emphasis added). *See also* [*id.*] 58 ("Ford Gum is a top manufacturer and co-manufacturer of assorted gums, confections, and health-related products for leading American brands."). And the website acknowledges that Big League Chew was "[i]nvented by Portland Mavericks lefthander Rob Nelson in 1980[.]" [*Id.*] 53.

---

[15] The Court notes that this latter assertion is irrelevant to the question of infringement of the shredded gum trade dress, as there is no dispute that that trade dress is not registered.

Based solely on these screenshots, and without any accompanying explanation or further elaboration, the Court cannot see where defendant's website holds defendant out as Big League Chew and the owner of the Big League Chew trademarks, the shredded gum trade dress, and the Big League Chew products, particularly where there is a License Agreement in place granting defendant the right to manufacture and be the source of the shredded gum, *i.e.*, the licensed product. [8] 7; [55] 8. If anything, defendant's website seems to be in accordance with the rights granted to defendant by the License Agreement, *i.e.*, "to use the Trademarks, the Trade Dress and the Copyrights in connection with manufacturing, *marketing and selling* shredded gum in a pouch . . . ." [1-1] 3, 6 (emphasis added).

Perhaps plaintiffs take issue with the lack of any specific mention or acknowledgment of Big League Chew Properties, LLC or The Rob Nelson Company on the "fordgum.com" website. After all, the License Agreement specifically includes the following directive regarding intellectual property protection:

(a)     All copyrighted packaging, *advertising, promotional materials and Trade Dress* used in connection with the Licensed Products shall carry a copyright notice in the form:

© (year date) The Rob Nelson Company. All Rights Reserved.

(b)     The Trademarks shall be used in such a manner as to avoid confusion among or deception to the public with regard to the origin of the Licensed Products. Licensee undertakes that the wrapper, container, carton, flyer, *advertisement* or other matter by which the Trademarks may be visually perceived will bear the ® symbol if the mark is registered and the ™ symbol if the mark is not and bear the following designation:

Trademarks Used Under License From The Rob Nelson Company

[1-1] 14–15 (emphases added). From the screenshots provided, it is clear that every use of "Big League Chew" is accompanied by the ® symbol. *See, e.g.*, [8-3] 48, 51, 53, 54, 57, 58. But the bottom of each webpage only includes "© 2024 Ford Gum. All rights reserved." *See, e.g.*, [*id.*] 50, 53, 59. Regardless, the Court cannot speculate as to the argument plaintiffs intend to make, and it "is not the obligation of th[e] court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) (quoting *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988)). *See also Williams v. Dieball*, 724 F.3d 957, 963 (7th Cir. 2013) ("It is not the district court's job to flesh out every single argument not clearly made. . . . Judges are not clairvoyant, and if they were required to go out of their way to analyze every

conceivable argument not meaningfully raised, their work would never end."); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.") (alteration in original) (internal quotations omitted). "The Seventh Circuit has 'repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'" *Parker v. Authority*, No. 18 C 2806, 2020 WL 7183747, at *8 (N.D. Ill. Dec. 7, 2020) (quoting *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017)).[16] *See also United States v. Williams*, 85 F.4th 844, 849 (7th Cir. 2023) (same).

Based on the foregoing, the Court recommends that the District Judge find that plaintiffs have not demonstrated a likelihood of success on the merits on their trade dress infringement claim.

## 2. Breach of License Agreement

Plaintiffs argue that defendant breached the License Agreement, entitling plaintiffs to injunctive relief by the agreement's terms. [8] 8. Pointing to Sections 9(a)–(c), 12(b), and 22(a)–(b), plaintiffs assert that the License Agreement states that plaintiffs are the exclusive owners of intellectual property rights in Big League Chew® and prohibits defendant from registering plaintiffs' marks in Ford Gum's name, challenging plaintiffs' rights in the marks in court, claiming any right in plaintiffs' marks, or competing with plaintiffs in the manufacture, sale, or distribution of any shredded gum. [*Id.*] 9 (citing [1-1] 10–11, 14–15, 24). Specifically, plaintiff argues that defendant breached the License Agreement when it "fraudulently mispresented to the PTO that Ford Gum created the concept of shredded bubble gum and has been manufacturing it since 1979[.]"[17] [*Id.*] Defendant argues that the License Agreement is silent with respect to the shredded gum trade dress and that it is therefore not possible that defendant could have breached the License Agreement by filing the subject USPTO application. [51] 4, 9–10; [34] 5. Defendant argues that the defined terms for "trademarks," "copyrights," and "trade dress" do not include the shape of the product, [51] 4, and that plaintiffs therefore do not claim to own any shredded gum trade dress in the License Agreement, [34] 5.

---

[16] *See also Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008); *Denkewalter v. Thomas*, 20 C 5013, 2023 WL 3479165, at *9 (N.D. Ill. May 16, 2023); *City of Geneva v. Patel*, No. 2-23-0123, 2023 WL 8785873, at *8 n.5 (Ill. App. Ct. Dec. 19, 2023); *In re Marriage of Knoll & Coyne*, 65 N.E.3d 878, 899 (Ill. App. Ct. 2016); *Johnson v. Gen. Bd. Of Pension & Health Benefits of United Methodist Church*, 2016 WL 2865154, at *7 (May 16, 2016); *People v. Ogurek*, 826 N.E.2d 605, 609 (Ill. App. Ct. 2005).

[17] The Court recognizes that plaintiffs' complaint alleges a number of ways in which defendant breached the License Agreement. *See* [1] ¶ 214. However, on the motion before the Court, plaintiffs only seek a preliminary injunction for breach of contract based on defendant's filing of the application for registration of the shredded gum configuration with the USPTO. [8] 9. *See also* [*id.*] 2 ("Ford Gum's brazen attempt to steal Plaintiffs' intellectual property rights, in blatant violation of the parties' license agreement, necessitates a preliminary injunction."), 7 ("Nelson also had his attorneys inform Ford Gum that its Trademark Application was improper, unauthorized, and in violation of the Ford Gum License Agreement.").

"A trademark licensee's right to use of a mark is defined by the valid terms of the trademark license. That is, the license defines the boundaries of the licensee's permitted use." *Rosati's Franchise Sys., Inc. v. Rosati*, No. 05 C 3146, 2006 WL 163145, at *5 (N.D. Ill. Jan. 17, 2006) (quoting 4 McCarthy, *supra*, § 25:30, at 25–60 (2004)). "A license to use a trademark is a contract, and disputes over the language of a trademark license are governed by the rules of contract interpretation." *Geneva Int'l*, 608 F.Supp.2d at 998. *See also Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 760 n.5 (7th Cir. 2006) ("Trademark license contract disputes . . . are governed by the general rules of contract interpretation."); *A&L Indus.*, 2021 WL 3856745, at *7 (citing 3 McCarthy, *supra*, § 18:43).

The beginning of the License Agreement states that The Rob Nelson Company (TRNC), through its predecessors-in-interest, "has developed a theme for a shredded gum in a pouch called BIG LEAGUE CHEW[.]" [1-1] 2. The License Agreement provides the following definitions relevant to the instant motion:

(a) "Trademarks" shall mean *trademarks which are comprised of the term* "BIG LEAGUE," including, without limitation all common law trademarks for BIG LEAGUE CHEW, and the registrations listed in Schedule l(a) annexed hereto, and the goodwill associated therewith.

(b) 'Trade Dress" shall mean original artwork, graphics, and associated package designs, characters, displays, literary materials, and audio and visual materials which are applied to packaging and advertising for or used in connection with the Licensed Products whether provided by TRNC or Licensee.

(c) "Copyrights" shall mean all copyrights subsisting in the Trade Dress and all advertising materials at common law.

(d) "Licensed Products" shall mean:

(i) shredded gum in a pouch which is developed, manufactured and sold *in association with the Trademark* (e.g. BIG LEAGUE CHEW shredded gum);

(ii) any line extensions into other confectionery categories utilizing the BIG LEAGUE brand, and;

(iii) all non-BIG LEAGUE brand items utilizing shredded gum.

NOTE: (ii) and (iii) require the prior written approval of TRNC. Such approval not to be unreasonably withheld.

23

[1-1] 4–5 (emphases added). Schedule 1(a) attached to the License Agreement contains a list of registered word marks. [*Id.*] 32. The License Agreement consistently refers to plaintiffs' various forms of intellectual property as being used in connection with the shredded gum, *i.e.*, the licensed product, rather than treating the shredded gum itself as a form of intellectual property. For example, the definition of "Trade Dress" focuses on packaging and any mention of the configuration or shape of the gum itself is notably absent. Plaintiffs' reply and their opposition to defendant's motion for preliminary injunction argue that the trade dress concept of shredded gum is central to the definition of Licensed Products in the License Agreement. [55] 4–5; [52] 7. But all of the sections to which plaintiffs point as evidence that defendant breached the Licensing Agreement by filing the trade dress registration application use and focus on the term "Trademarks," not "Licensed Products." Plaintiffs' reply and their opposition to defendant's motion also assert that Section 1(a) "defines 'Trademarks' as both registered and common law trademarks for Big League Chew®." [52] 7; [55] 5. However, as emphasized above using italics, the agreement's definition explicitly limits the term "Trademarks" to "trademarks which are comprised of the term 'BIG LEAGUE,'" and within *that* meaning is included common law and registered marks. In other words, common law word marks using the term "BIG LEAGUE" are included, but such a narrowly worded definition would not include other forms of trademarks/trade dress like pictures or the shape of the gum. Those are not "comprised of the term 'BIG LEAGUE.'"

Section 9 of the License Agreement is titled "Ownership" and subsection (a) states that "[l]icensee acknowledges that TRNC owns all right, title, and interest in and to the Trademarks and the goodwill symbolized by the Trademarks." [1-1] 10. Subsection (a) also states that "TRNC shall be the sole and exclusive owner of all trademarks, copyrights, trade dress, artwork, packaging design, logos, copy, literary text and advertising material of any sort which in any way utilizes, incorporates or is associated with the Trademarks including all such materials developed by or for Licensee." [*Id.*] 10–11. This sentence may function as a "catch all" statement that uses the lowercase "trademarks" and "trade dress" to include all other comprehendible trademarks or trade dress associated with the Trademarks but not defined in the License Agreement. [52] 7–8. But again, the sections of the License Agreement prohibiting the action which plaintiffs assert constituted a breach of the agreement make use of the capitalized and clearly defined terms. For example, subsection b instructs as follows:

> Licensee shall not register or apply to register the Trademarks, or any confusingly similar trademarks in its own name, in any country for any purpose, or represent that it owns the Trademarks. Licensee will not attack, or challenge in any court of law or other tribunal anywhere in the world or challenge in any other manner, TRNC's right and title to the Trademarks or TRNC's ownership of any Copyrights in or distinctive

features of the Trademarks, or the validity or enforceability of the Trademarks, Copyrights or Trade Dress.

[*Id.*] 11.[18] These statements very specifically use the capitalized term "Trademarks," thereby referring to the term as defined by the License Agreement. Nowhere in Section 9 is the term "shredded gum," and the only use of "Licensed Products" is in subsection (d) involving domains registered during the term of the agreement. *See* [1-1] 11–12.

Section 12(b) states, in relevant part, that "[t]he Trademarks shall be used in such a manner as to avoid confusion among or deception to the public with regard to the origin of the Licensed Products." [1-1] 14. Again, the focus is on the use of the capitalized term "Trademarks" as defined by the agreement. Specifically, this subsection requires any use of the Trademarks in such a manner that they will be "visually perceived" to include the ® symbol if the mark is registered, the ™ symbol if not, and addition of the following designation: "Trademarks Used Under License From The Rob Nelson Company." [*Id.*] 14–15. Defendant's application with the USPTO does not mention "Big League" or "Big League Chew" or any such iteration. *See* [1-6]. Plaintiffs do not further develop or elaborate on their argument invoking Section 12(b).

Citing Section 22(b), plaintiffs argue that "[a]ny unauthorized manufacture, sale or distribution of shredded gum is a violation of the License Agreement entitling BLC to injunctive relief." [52] 7. Section 22 of the License Agreement is the non-compete clause, which provides in subsection (a) that during the term of the agreement and for a period of three years after the termination date, unless acting with plaintiffs' prior written consent, defendant "will not . . . engage in the manufacture, sale or distribution of any shredded gum, or any other category of the Licensed Products." [1-1] 24. Subsection (b) states that "[a]ny violation *of this covenant* will result in irreparable injury to TRNC, and the remedy at law for any breach *of the foregoing covenant* will be inadequate, and in the event of any such breach, TRNC . . . shall be entitled to temporary injunctive relief before trial from any court of competent jurisdiction as a matter of course." [*Id.*] 24–25 (emphases added). It would seem that the remedy of a preliminary injunction, therefore, only applies to breaches of this particular non-compete provision, not to any breach of any part of the License Agreement. Plaintiffs' motion has not shown that defendant

---

[18] Subsection (c) involves situations in which defendant authorizes the creation of any material or work or original art that may be protectible as a copyright or trademark for use in association with the Licensed Products and instructs that defendant will not acquire or claim any right, title, or interest in these created works and that defendant will agree to assign to plaintiffs any such rights that defendant might have. [1-1] 11. *See* [52] 8 (plaintiffs' opposition to defendant's motion for preliminary injunction explaining that this section states defendant "cannot acquire any rights in marks created during the course of the License Agreement"). The creation of new works in connection with and used in association with the shredded gum is not the factual scenario here and the Court thus does not see how Section 9(c) of the License Agreement applies to the instant case.

breached this provision. As noted in the Court's analysis of plaintiffs' claim of trademark infringement, the only action defendant has taken so far is filing the application in the USPTO for registration of the shredded gum configuration in Ford Gum's name and "holding itself out as the owner" in that application. Plaintiffs have not put forth any evidence of defendant's manufacture, sale, or distribution of shredded gum on defendant's own behalf or otherwise outside the confines of the manufacture, sale, and distribution permitted by the License Agreement. In other words, plaintiffs have not demonstrated a likelihood of success on the merits as to any claim that defendant breached this particular provision of the License Agreement.

Plaintiffs also very briefly raise the argument that under the doctrine of licensee estoppel, defendant cannot challenge plaintiffs' trade dress rights in the shredded gum product that the License Agreement permits defendant to manufacture. [8] 13 (citing *Chi. Mercantile Exch., Inc. v. ICE Clear US, Inc.*, No. 18 C 1376, 2020 WL 4430562, at *2 (N.D. Ill. July 31, 2020); *Sunstar, Inc. v. Alberto-Culver Co.*, No. 01 C 0736, 2004 WL 1899927, at *16, 18 (N.D. Ill. Aug. 23, 2004)). Defendant argues that because the License Agreement is silent with respect to shredded gum trade dress, there can be no estoppel against defendant. [51] 13. "Under the doctrine of licensee estoppel, during the course of the license, a licensee is estopped from claiming it owns or disputing the validity of the licensor's trademark." *Chrysler Motors Corp. v. Alloy Auto. Co., Inc.*, 661 F.Supp. 191, 192 (N.D. Ill. 1987) (citations omitted). *See also Sunstar*, 2004 WL 1899927, at *16 (same). "The basis for this rule is that a licensee who freely enters into a license and pays royalties or agrees to the limitations imposed by a licensor effectively recognizes that the licensor possesses a valid trademark." *Chrysler Motors Corp.*, 661 F.Supp. at 192–93. However, as assessed above, the Court is not satisfied that plaintiff has shown that the trademarks or trade dress that are the subject of the License Agreement include the shredded gum configuration. Furthermore, the Court may consider plaintiff's perfunctory and undeveloped single-sentence argument waived. *Williams*, 85 F.4th at 849; *Williams*, 724 F.3d at 963; *Parker*, 2020 WL 7183747, at *8.

Based on the foregoing, the Court recommends that the District Judge find that plaintiffs have not demonstrated a likelihood of success on the merits on their breach of contract claim.

## B.    Irreparable Harm

The Seventh Circuit has defined irreparable harm "as harm that 'cannot be repaired' and for which money compensation is inadequate." *Orr*, 953 F.3d at 502 (quoting *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997)). *See also DM Trans, LLC*, 38 F.4th at 618 ("Harm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered."). "In the context of trademark law, once the movant establishes a

likelihood of success on the merits, it is statutorily entitled to a rebuttable presumption of irreparable harm."[19] *Grubhub Inc.*, 80 F.4th at 844 (citing 15 U.S.C. § 1116(a)). *See Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *Zhang v. UAB Ekomlita*, No. 22-cv-05057, 2023 WL 2867798, at *11 (N.D. Ill. Apr. 10, 2023). *See also Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) (noting that "irreparable harm is especially likely in a trademark case"); *SBA-TLC, LLC v. Merlin Corp.*, No. 15 C 8426, 2015 WL 6955493, at *2 (N.D. Ill. Nov. 10, 2015) ("Trademark cases are particularly likely to result in irreparable harm because it is so difficult to monetize the likely effect on the brand of a given period of customer confusion. . . . Indeed, the Seventh Circuit presumes irreparable harm in trademark and trade dress infringement cases.").

Because the Court has recommended that the District Judge find plaintiffs have not demonstrated a likelihood of success on the merits of either their trademark infringement claim or their claim of breach of the License Agreement (the only two claims on which they base their motion for preliminary injunction), the Court need not engage in an analysis of whether plaintiffs have established irreparable harm.

## C.    Traditional Legal Remedies are Inadequate

"These two requirements—irreparable harm and no adequate remedy at law—tend to merge." *Holbrook Mfg LLC v. Rhyno Mfg. Inc.*, 497 F.Supp.3d 319, 332 (N.D. Ill. 2020) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). And the Seventh Circuit similarly "presumes inadequate remedy at law in trademark and trade dress infringement cases." *Merlin Corp.*, 2015 WL 6955493, at *2 (citing *Dunkin' Donuts Franchised Restaurants LLC v. Elkhatib*, 2009 WL 2192753, at *4 (N.D. Ill. July 17, 2009)). *See also Rosati v. Rosati*, No. 20-cv-07762, 2021 WL 3666432, at *11 (N.D. Ill. Aug. 18, 2021) ("It has been long been the law in the Seventh Circuit that the lack of an adequate remedy at law and irreparable harm are generally presumed in trademark infringement actions."); *Holbrook Mfg*, 497 F.Supp.3d at 333 ("Traditionally, the Seventh Circuit applied a presumption that

---

[19] "This presumption was called into doubt when the Supreme Court rejected the same presumption in patent infringement cases, *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), and the Seventh Circuit subsequently did away with it in copyright cases, *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012)." *Holbrook Mfg LLC*, 497 F.Supp.3d at 333. *See Rosati v. Rosati*, No. 20-cv-07762, 2021 WL 3666432, at *11 (N.D. Ill. Aug. 18, 2021) ("*Park Ridge Sports*—and other decisions from this District reaching the same conclusion . . . anticipated, as a result of *eBay*, that the Seventh Circuit was likely to overturn *Eli Lilly* and that there should be no presumption of irreparable harm. . . . Contrary to *Park Ridge Sports*, however, other courts in this District have concluded that the better course is to continue to apply *Eli Lilly*'s presumption of irreparable harm until the Seventh Circuit revisits the issue."). However, since *eBay*, "a December 2020 amendment to the Lanham Act codified the presumption in the trademark infringement context." *LandAirSea Sys., Inc. v. Synchronize Income Dev., LLC*, No. 23 CV 4964, 2024 WL 1657355, at *6 (N.D. Ill. Feb. 8, 2024) (citing 15 U.S.C. § 1116(a)). The Seventh Circuit has since acknowledged the amendment and reaffirmed that after establishing a likelihood of success on the merits, a movant is entitled to a rebuttable presumption of irreparable harm. *Grubhub Inc.*, 80 F.4th at 844.

when a plaintiff sufficiently establishes trademark infringement, the plaintiff will suffer irreparable harm and have no adequate remedy at law absent an injunction."). Otherwise, "[t]o show that no adequate remedy at law exists, a plaintiff must 'show that an award of damages at the end of trial will be inadequate [or] seriously deficient as a remedy for the harm suffered.'" *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, No. 08 C 0950, 2008 WL 4865568, at *9 (N.D. Ill. July 14, 2008) (alteration in original) (quoting *Roland Mach. Co.*, 749 F.2d at 386). *See also Merlin Corp.*, 2015 WL 6955493, at *2 (same); *NTE LLC v. Kenny Constr. Co.*, No. 14 C 9558, 2015 WL 500623, at *4 (N.D. Ill. Feb. 4, 2015) (same).

Again, however, because the Court has recommended that the District Judge find plaintiffs have not demonstrated a likelihood of success on the merits of their claims, the Court need not engage in an analysis of whether plaintiffs have established there is no adequate remedy at law.

## D.    Conclusion

The Court recommends that the District Judge find that plaintiffs have not met their burden to demonstrate a likelihood of success on the merits and, accordingly, deny plaintiffs' motion for preliminary injunction.

### Defendant's Motion for Preliminary Injunction

Defendant seeks a preliminary injunction prohibiting plaintiffs from (1) interfering with Ford Gum's efforts to enforce trade dress rights it owns in the shape of the shredded gum product it makes and sells; and (2) depriving Ford Gum of continued performance of the License Agreement dated July 16, 2010 and the agreement dated March 26, 2024. [34] 2; [23] 73. More specifically, defendant asserts that "BLC should be preliminarily enjoined from challenging the Shredded Gum Trade Dress application and/or resulting registration at the USPTO pending trial in this action" and that "BLC should be preliminarily enjoined from contracting with another gum manufacturer pending trial." [34] 4, 14.

## A.    Likelihood of Success on the Merits

Defendant's counterclaims seek (1) a declaratory judgment that Ford Gum owns the shredded gum trade dress (Count I); (2) a declaratory judgment that Ford Gum is not infringing any intellectual property or contractual rights of plaintiffs/counter-defendants (Count II);[20] (3) specific performance of the March 2024 Agreement, including a court order prohibiting plaintiffs from claiming ownership of the shredded gum trade dress and/or from interfering with Ford Gum's efforts to enforce the shredded gum trade dress (Count III); and (4) specific performance of the

---

[20] Defendant's motion for preliminary injunction does not mention its second count and the Court therefore does not address Count II of defendant's counterclaims in this Report and Recommendation.

licensing agreement, including a court order prohibiting plaintiffs from contracting with another manufacturer to make products that Ford Gum has the exclusive right to manufacture under the license agreement (Count IV). [23] 101–05.

### 1.    Defendant's First and Third Counterclaims

Defendant argues that it is likely to succeed on its first count for a declaratory judgment that Ford Gum owns the shredded gum trade dress and its third count for specific performance of the March 2024 Agreement. [34] 8. As previously articulated in assessing plaintiffs' motion, "[t]he moving party's likelihood of prevailing on the merits must exceed 'a mere possibility of success.'" *DM Trans, LLC*, 38 F.4th at 617 (quoting *Life Spine, Inc.*, 8 F.4th at 540). "[W]hile a movant need not prove its claims at this stage by a preponderance of the evidence, it must demonstrate at a minimum how it proposes to prove the key elements of its case." *Grubhub Inc.*, 80 F.4th at 844 (citing *Pritzker*, 973 F.3d at 763). *See also K.C.*, 121 F.4th at 646 (stating that courts ask the movant to demonstrate how it proposes to prove the key elements of its case "and evaluate its chance of success based on this proffer").

Defendant asserts that it can prove that plaintiffs have no rights to the shredded gum trade dress based on the following actions and inactions of plaintiffs:

> (i) for decades failed to file an application at the USPTO to register the Shredded Gum Trade Dress;
> (ii) failed to include the Shredded Gum Trade Dress in the License Agreement;
> (iii) hasn't used the Shredded Gum Trade Dress since at least July 2010;
> (iv) refused repeatedly to enforce the Shredded Gum Trade Dress against infringers, including most recently in 2024;
> (v) entered into to [sic] the March 2024 Agreement so that Ford Gum would own, apply for, enforce, and pay for the Shredded Gum Trade Dress "on behalf of Ford Gum";
> (vi) performed the March 2024 Agreement by, at least, providing to Ford Gum information regarding the a [sic] second Shredded Gum Trade Dress infringement on July 31, 2024 so that Ford Gum would again enforce it;
> (vii) reaffirmed the March 2024 Agreement in writing on September 13, 2024; and
> (viii) reaped the benefit of the March 2024 Agreement through Ford Gum's successful enforcement efforts.

[34] 9. The Court will address the first four points before turning to arguments involving the March 2024 Agreement. These four assertions all overlap with arguments made in defendant's opposition to plaintiffs' motion for preliminary injunction that the Court has already addressed.

Defendant's first and fourth points are unpersuasive. Like in its brief opposing plaintiffs' motion, defendant's motion again includes a section arguing that plaintiffs "purposefully disavowed shredded gum trade dress rights" because they never applied for and do not own any registration for any shredded gum trade dress and because plaintiffs "never" enforced their rights against infringers. [34] 5–6. First, as the Court has pointed out several times, defendant's criticism that plaintiffs "for decades failed to file an application at the USPTO to register the Shredded Gum Trade Dress" is a nonstarter. It is exceedingly clear that federal registration of a trademark or trade dress is not mandatory and that the Lanham Act protects registered *and* unregistered trademarks/trade dress. *Vidal*, 602 U.S. at 291; *Iancu*, 588 U.S. at 391; *Matal*, 582 U.S. at 225; 15 U.S.C. §§ 1115, 1125. Again, trademark ownership "is not acquired by federal or state registration," but rather "from prior appropriation and actual use in the market." *S.C. Johnson & Son*, 835 F.3d at 665 (citation omitted). Despite this "bedrock principle[ ] of trademark law," *id.*, defendant does nothing to address plaintiffs' superior right to the trade dress as the first to use it in commerce or explain why plaintiffs' failure to register supports a finding that plaintiffs have no rights to the shredded gum trade dress.

Defendant's fourth point that plaintiffs have "refused repeatedly to enforce the Shredded Gum Trade Dress against infringers, including most recently in 2024" similarly fails. Defendant again does not develop any argument or provide any case law in support of the suggestion that non-enforcement of trademark or trade dress rights against third-party infringers diminishes claims of ownership or results in the loss of those rights. *See* [52] 11–12 (arguing that defendant "does not identify any theory of trademark abandonment that could arise from lack of enforcement"). "The Seventh Circuit has 'repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'" *Parker*, 2020 WL 7183747, at *8 (quoting *Cisneros*, 846 F.3d at 978). Even through a generous reading of defendant's briefing on this point and assessing this argument under theories of abandonment and naked licensing, the Court recommends that the District Judge find that defendant has not met its burden to demonstrate that plaintiffs intentionally abandoned or unintentionally relinquished their rights in the shredded gum trade dress by failing to enforce it against infringers.

Second, defendant faults plaintiffs for failing to include "Shredded Gum Trade Dress" in the License Agreement, repeatedly emphasizing that the *License Agreement* does not identify and claim the shredded gum configuration as trade dress or include it in the definition of "trademarks." [34] 5, 11; [56] 3–4. *See, e.g.*, [56] 2 ("Plaintiffs attack the 'March 2024 Agreement' to no avail. Because nothing in the License Agreement prohibits Ford Gum from applying to register the Shredded Gum Trade

Dress, Ford Gum did not need Plaintiffs' approval to own and register it.").[21] It is not clear to the Court why this matters where plaintiffs can clearly establish superior ownership rights as the first party to appropriate the shredded gum trade dress through use in commerce and as a designation of source. *Vidal*, 602 U.S. at 333; *Hana Bank*, 574 U.S. at 419; *Johnny Blastoff*, 188 F.3d at 434; *Grunt Style LLC*, 598 F.Supp.3d at 688; *Brithric Enters.*, 2021 WL 1208957, at *4. Even if the failure to explicitly include the shredded gum configuration as plaintiffs' intellectual property and within the definition of "trade dress" was a conscious decision made by plaintiffs in drafting the License Agreement (whether based on a mistaken understanding of protectable trade dress or not), defendant makes no argument for why such failure diminishes or negates a common law superior right in the trade dress based on first use in commerce.

Third, as previously discussed, defendant's argument that plaintiffs have not "used the Shredded Gum Trade Dress since at least July 2010" is unpersuasive and inaccurate. A trademark owner "need not use the trademark through its own use to satisfy the 'use in commerce' requirement." *Slep-Tone Ent. Corp.*, 75 F.Supp.3d at 904. Rather, "the law is clear that the 'use in commerce' requirement may be satisfied through use of the trademark by controlled licensees[.]" *Id.* at 905. *See also Gaffrig Performance Indus.*, 2003 WL 23144859, at *10 ("A licensee's use of a mark inures to the benefit of the licensor, and the licensee acquires no ownership rights in the mark itself."). Entering into the License Agreement did not constitute an abandonment of the trade dress or a cutoff in plaintiffs' use of the trade dress; ownership rights in a trademark "can be . . . maintained through the use of the mark by a controlled licensee . . . ." *Ty, Inc.*, 2005 WL 464688, at *2 (quoting 4 McCarthy, *supra*, § 18:46).

Notwithstanding these assertions, defendant's primary argument is that it can also prove that "Ford Gum ***is*** the owner of the Shredded Gum Trade Dress under the March 2024 Agreement." [34] 10 (emphasis in original). "A valid assignment entitles the assignee to 'step into the shoes' of the assignor and gain whatever priority the assignor might have had in the mark." *Medscript Pharmacy*, 444 F.Supp.3d at 914 (citing *Archer Daniels Midland Co. v. Narula*, No. 99 C 6997, 2001 WL 804025, *5

---

[21] Defendant's reply brief also argues that Section 22 of the License Agreement is further proof that plaintiffs do not own the shredded gum trade dress because "Section 22 expressly permits Ford Gum to make and sell shredded gum three years after the License Agreement terminates without consent from Plaintiffs" and there cannot be two sources of the same trade dress. [56] 2 (citing *Jack Daniel's Properties v. VIP Prods. LLC*, 599 U.S. 140, 157 (2023)). But this argument was not raised in defendant's motion and the Court therefore does not consider it, as "arguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." *White v. United States*, 8 F.4th 547, 552–53 (7th Cir. 2021). *See also O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived."); *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (stating that "the district court is entitled to find that an argument raised for the first time in a reply brief is forfeited"); *Peterson v. Vill. of Downers Grove*, 103 F.Supp.3d 918, 925 (N.D. Ill. 2015) ("Arguments raised for the first time in reply briefs are ordinarily waived, and rightly so given the lack of opportunity for the other party to respond to them.").

(N.D. Ill. July 12, 2001)). *See, e.g.*, [8-3] 20–46 (defendant's registration application and supporting declaration filed with the USPTO alleging facts consistent with an assertion that defendant "stepped into plaintiffs' shoes").

Generally, "the issue of whether a transaction constitutes a transfer of trademark rights will be determined by applying the usual rules of contract law." 3 McCarthy, *supra*, § 18:4. Under Illinois law,[22] "an offer, an acceptance, and consideration are the basic ingredients of a contract." *Tindall Corp. v. Mondelez Int'l, Inc.*, 248 F.Supp.3d 895, 904 (N.D. Ill. 2017) (quoting *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006)). To find an enforceable contract exists, "there can only be a binding offer and acceptance when the parties mutually assent to definite and certain terms." *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 522 (7th Cir. 2022). *See also Beverly v. Abbott Labs.*, 817 F.3d 328, 333 (7th Cir. 2016) (stating that an "agreement is enforceable if there was a meeting of the minds or mutual assent to all material terms"); *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007) ("No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by an acceptance."); *Szafranski v. Dunston*, 34 N.E.3d 1132, 1147 (Ill. App. Ct. 2015) ("To be enforceable, the material terms of a contract must also be definite and certain.").

Contract terms are considered "definite and certain . . . if a court is able to ascertain what the parties agreed to . . . ." *Kap Holdings, LLC*, 55 F.4th at 522 (alterations in original) (quoting *Szafranski*, 34 N.E.3d at 1147). Courts recognize that "[t]his framework affords certain flexibility, and '[a] contract may be enforced even though some contract terms may be missing or left to be agreed upon.'" *Id.* (quoting *Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991)). "But there can be no binding contract when 'the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken.'" *Id.* at 522–23 (quoting *Cheever*, 578 N.E.2d at 984). Put another way, the agreement must be so definite as to its material terms that "the promises and performances to be rendered by each party are reasonably certain." *Berkshire Invs., LLC v. S-Pro, LLC*, No. 22 CV 5407, 2023 WL 5165663, at *3 (N.D. Ill. Apr. 13, 2023) (quoting *Cheever*, 578 N.E.2d at 983). "Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentives to identify expressly the ownership of the marks they employ." *TMT N. Am.*, 124 F.3d at 884.

As the party seeking to enforce the agreement, "defendant bears the burden of establishing the existence of the agreement." *Shuffle Tech. Int'l LLC v. Wolff Gaming, Inc.*, 950 F.Supp.2d 977, 980 (N.D. Ill. 2013) (citing *World Championship Wrestling*,

---

[22] Neither party raises an issue regarding the choice of law to apply in determining the formation and existence of a contract here, nor disputes that Illinois law applies.

13 F.Supp.2d at 734). Defendant insists that this "March 2024 Agreement is a valid and enforceable contract for Ford Gum to own, apply for, and enforce the Shredded Gum Trade Dress, on Ford Gum's own behalf, and at Ford Gum's expense." [34] 9. However, defendant's motion provides no developed argument as to *why* the March 2024 Agreement is a valid and enforceable contract. Defendant's motion, and its brief opposing plaintiffs' motion, do not engage in any substantive analysis of or argument on contract formation or assignment of trademark rights, nor cite any supporting case law for defendant's position. Instead, defendant offers only conclusory assertions that in Lerner's email, Ford Gum "offered to enter into an agreement with BLC for Ford Gum to own, apply for, enforce, and pay for the Shredded Gum Trade Dress 'on behalf of Ford Gum'" and that "BLC accepted the offer." [34] 6 (citing [33-2] ¶ 13–16; [33-23]). *See also* [51] 8 (arguing that in the email, Ford Gum "offered to own, apply for, enforce, and pay for the Shredded Gum Trade Dress in order to stop infringements" and that plaintiffs "accepted this offer in the March 2024 agreement"); [33-2] ¶ 18 (Lerner's declaration asserting that, "When Mr. Nelson accepted my March 26, 2024 proposal, Plaintiffs and Ford Gum entered into . . . the 'March 2024 Agreement' for Ford Gum to own, apply for, enforce, and pay for the Shredded Gum Trade Dress."). This is insufficient; merely saying something doesn't make it so.[23]

Lerner's March 26, 2024 email to Nelson and Bob Anderson (the "offer") stated the following:

> Considering the recent discovery of a potential competitive product to Big League Chew, Ford Gum would like to file for a trade dress on the product form of "shredded gum". Once we due [sic] this we would like to send a cease-and-desist letter to Hilco. I am seeking your approval for us to take this action on behalf of Ford Gum. If you want to discuss this live, I might suggest we set up a call for next week. Thanks.

[33-23] 2. That same day, Nelson responded[24] with the following: "Scott - excellent idea. I approve." [*Id.*] In further support of its position that these two emails

---

[23] *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510–11 (7th Cir. 2010); *Nat'l Van Lines v. First Nat'l Van Lines, Inc.*, No. 22 C 4558, 2023 WL 3602803, at *2 (N.D. Ill. May 23, 2023); *Generation Brands, LLC v. Decor Selections, LLC*, 2021 WL 780485, at *2 (N.D. Ill. Mar. 1, 2021).

[24] Defendant's reply brief and supporting declarations make much of the fact that Nelson "graduated from Cornell University, with a degree in Philosophy, and earned a master's degree in education at the State University of New York" and "is highly intelligent" with "a solid command of the English language." [56] 13 (citing [35] ¶ 42; [33-2] ¶ 17; [8-3] 162). *See also* [*id.*] 2 ("When Mr. Nelson, an Ivy League graduate with a masters' degree, enthusiastically and unequivocally agreed on March 26, 2024 that Ford Gum would apply for and enforce the Shredded Gum Trade Dress 'on behalf of Ford Gum,' (ECF 33-23), he knew this meant Ford Gum would own the Shredded Gum Trade Dress."). The Court does not find this point particularly persuasive. Defendant provides no authority for its suggestion that the sophistication of the parties entering into the alleged contract is relevant here in determining whether a contract was formed and is enforceable. And there is other evidence and argument in the record presented to the Court contradicting defendant's point. *See* [56] 9 (defendant's reply also arguing that Nelson's "reference to patents, rather than trade dress, demonstrates Plaintiffs knew

constitute a valid contract, defendant points to a text message sent by Nelson to Lerner on September 13, 2024 that defendant argues "confirmed" and "reaffirmed" the March 2024 Agreement. [34] 2–3, 6, 7, 9, 10 (citing [33-2] ¶ 49; [33-28]); [56] 2, 14–15. Although that text is lengthy, defendant consistently relies only on certain abbreviated statements from the message, asserting that Nelson sent the text "confirming that he was 'good with' the March 2024 Agreement and that 'Ford Gum will own the trade dress.'" *See, e.g.*, [34] 7 (quoting [33-2] ¶ 49; [33-28]).

In opposition to this characterization of the emails as an "agreement," plaintiffs argue that based on the emails' lack of material terms and the context of the parties' business relationship up to this point, "there is no reasonable basis to conclude that the emails constitute a meeting of the minds to give away" the rights in the shredded gum trade dress. [52] 13 (collecting cases). Plaintiffs point out that it is unreasonable to construe the email exchange as a contract assigning the trade dress rights to defendant "in light of the fact that, for more than fourteen years, the parties extensively documented changes to their relationship in detailed, formal agreements, including the License Agreement and its three amendments, the Equipment Lease Agreement, the Equipment Purchase Agreement, and a Letter of Understanding—with two modifications—governing royalties."[25] [*Id.*] (citing [33-10, 33-12, 33-14]). Defendant disagrees, criticizing plaintiffs for failing to identify any term that is missing from the March 2024 Agreement. [56] 12. But as previously noted, it is *defendant's* burden, as the party seeking to enforce the contract, to establish that all material terms were included and were sufficiently definite and certain.

Defendant's reply argues that the material terms here are that "Ford Gum would own, register, and enforce the Shredded Gum Trade Dress at its own expense" and that these terms are "sufficiently definite and certain." [56] 12. *See* [34] 9 (defendant's motion arguing that "March 2024 Agreement is a valid and enforceable contract for Ford Gum to own, apply for, and enforce the Shredded Gum Trade Dress, on Ford Gum's own behalf, and at Ford Gum's expense"). The Court notes, however, that Lerner's "offer" email does not mention anything about expenses for the filing of the trade dress application and sending the cease-and-desist letter, much less that defendant specifically will cover the expenses. Nor does Nelson's September 13, 2024 text message serve to support defendant on this point, as Nelson stated in that text, "I am willing to contribute to the expense that was required to acquire this

---

nothing about product configuration trade dress"); [33-22] 3 (February 21, 2024 email from Nelson to Spigner stating, "I'm no attorney, so I have no idea what we can do.").

[25] Other evidence in the record before the Court supports the suggestion that this alleged March 2024 Agreement created by an email exchange is an abnormality in the parties' past practices of "extensively documenting" changes to their business relationship. For example, Nelson's declaration points out that other offers from defendant to obtain ownership of Big League Chew and its intellectual property were formally presented in writing and spanned multiple pages, including two acquisition proposals dated March 25 and March 26, 2024, at the same time as the March 26, 2024 email exchange between Lerner and Nelson. [8-3] 2–18; [8-1] ¶¶ 61–64.

protection." [33-28] 2. The "offer" email also does not indicate with certainty that the agreement would serve to create a duty for defendant to engage in enforcement of the shredded gum trade dress in *all* instances of infringement. Rather, it very specifically refers to sending a cease-and-desist letter to one particular third-party infringer, Hilco, and does not mention enforcement efforts against all future third party infringers. [33-23] 2.

The Court is also not persuaded by defendant's argument that "Nelson's September 13, 2024 text messages . . . clearly confirm that BLC intended for Ford Gum to own the Shredded Gum Trade Dress." [34] 9–10. Defendant insists that this September 2024 text message "is relevant and binding." [56] 14–15. In support, defendant repeatedly quotes a select, truncated portion of Nelson's text, asserting that plaintiffs "said 'Ford Gum will own the trade dress.'" [56] 15 (quoting [33-28]). But as the Court previously noted, Nelson's full message states, "It does seem odd that Ford Gum will own the trade dress protection and not I, but since it is likely you guys will eventually own all the Big League Chew trademarks anyway, the idea does make sense." [33-28]. Nelson's text continued, stating, "The goal has been to hold onto my Big League Chew stuff until BLC's 50th anniversary, but I am willing to listen to any new ideas Ford Gum has sooner than that." [33-28]. This language suggests an intention to enter into an agreement to transfer intellectual property rights at some point in the future and that it was not Nelson's intent to have already done so on March 26 with a mere "[E]xcellent idea. I approve." "An agreement to assign a mark in the future is not a present assignment and does not vest legal title at the time of the agreement." 3 McCarthy, *supra*, § 18:4. Again, the Court is more persuaded that Nelson's September 13 text weakens defendant's position that the March 2024 emails formed a valid and enforceable agreement.

Defendant also argues that the fact that a signed writing "is not even required refutes Plaintiffs' argument that a 'brief two-email exchange' is insufficient." [56] 12–13. Defendant is correct; assignments of common law trademark rights do not have to be in writing. *TMT N. Am.*, 124 F.3d at 885; *Ledo Pizza Sys., Inc. v. Ledo's Inc.*, No. 20 CV 7350, 2024 WL 1013897, at *5 (N.D. Ill. Mar. 7, 2024); *TWD, LLC*, 598 F.Supp.3d at 686; *Ultrasonic Power Corp. v. Crest Ultrasonics Corp.*, 2010 WL 11883647, at *4 (N.D. Ill. Mar. 1, 2010). *See also* 3 McCarthy, *supra*, § 18:4 (5th ed.) ("An assignment in writing is not necessary to pass common law rights in a trademark.").[26] But that fact has no bearing on whether the writing here sufficiently

---

[26] The Court notes that the Lanham Act does state that "[a]ssignments shall be by instruments in writing duly executed." 15 U.S.C. § 1060(a)(3). But assignments authorized by this section involve trademarks that are on the principal register, *i.e.*, "[a] registered mark or a mark for which an application to register has been filed[.]" *Id.* at § 1060(a)(1). *See* 2 McCarthy, *supra*, § 18:11 ("While an assignment in writing is not necessary to pass common law rights in a trademark, Lanham Act § 10 requires that assignments of federally registered marks or applications must be in writing."). The shredded gum trade dress at issue here is not registered and the question is whether plaintiffs transferred their common law rights in the shredded gum trade dress to defendant by dint of the March 2024 Agreement.

met the requirements of a valid and enforceable contract. And as noted, the Court is not convinced that defendant has demonstrated the presence of material terms that are sufficiently definite and establish that "the promises and performances to be rendered by each party are reasonably certain." *Berkshire Invs.*, 2023 WL 5165663, at *3.

Additionally, plaintiffs argue that the parties' emails could not form an enforceable contract because they convey no consideration to Big League Chew. [52] 14. *See also* [55] 6–7. "It is a basic tenet of contract law that in order for a promise to be enforceable against the promisor, the promisee must have given some consideration for the promise." *Asadollahi v. SpineCraft, LLC*, No. 20 C 2039, 2021 WL 722826, at *5 (N.D. Ill. Feb. 23, 2021) (quoting *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619, 624 (Ill. App. Ct. 2005)). "'Consideration' is defined as a bargained-for exchange, whereby one party receives a benefit or the other party suffers a detriment." *Id.* (citing *Vassilkovska*, 830 N.E.2d at 624). *See also LKQ Corp. v. Thrasher*, 785 F. Supp. 2d 737, 742 (N.D. Ill. 2011) (same). Put another way, "[a]ny act or promise that benefits one party or disadvantages the other is sufficient consideration to support the formation of a contract." *Bires v. WalTom, LLC*, 662 F.Supp.2d 1019, 1028 (N.D. Ill. 2009) (quoting *Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n*, 898 N.E.2d 216, 230 (Ill. App. Ct. 2008)).

For the first time in its reply brief,[27] defendant argues that the March 2024 Agreement is supported by consideration. [56] 11. Specifically, defendant asserts that the consideration in the March 2024 Agreement "was that Ford Gum would invest time, money, and resources into applying to register and enforce the Shredded Gum Trade Dress against infringers, all to the parties' mutual benefit." [56] 11. Defendant argues that its "USPTO application alone is more than adequate consideration." [*Id.*] In opposition, plaintiffs argue that "a promise by Ford Gum to enforce the Shredded Gum Trade Dress does not and could not constitute valid consideration" because the parties already agreed defendant could do this under Section 11(b) of the License Agreement. [52] 14. *See also* [55] 7 (arguing there is no consideration because "the License Agreement already (1) allows Ford Gum, as a licensee, to enforce BLC's intellectual property rights, and (2) protects the payment of royalties whether or not Ford Gum sent a singular cease-and-desist letter"). "Consideration cannot be something that the promisor is already obliged to give the promisee; it must be something additional or new." *Maroon Soc'y v. Unison Consulting Inc.*, No. 19 C 05117, 2020 WL 5076688, at *7 (N.D. Ill. Aug. 26, 2020) (citing *In re Globe Bldg. Materilas, Inc.*, 484 F.3d 946, 949 (7th Cir. 2007)). "The performance of a legal duty already owed to a promisor is not consideration." *Id. See Chi. Coll. of Osteopathic*

---

[27] Again, the Court "is entitled to find that an argument raised for the first time in a reply brief is forfeited," *Lukis v. Whitepages Inc.*, 542 F.Supp.3d 831, 843 (N.D. Ill. 2020), just as the Court may deem "perfunctory and undeveloped arguments" waived. *Parker*, 2020 WL 7183747, at *8 (quoting *Cisneros*, 846 F.3d at 978). *See also Williams*, 85 F.4th at 849 ("Just as undeveloped arguments are waived, so are arguments raised for the first time in reply briefs.").

*Med. v. George A. Fuller Co.*, 776 F.2d 198, 208 (7th Cir. 1985) ("Under the preexisting duty rule, agreement to do what one is contractually obligated to do is not valid consideration."). The Court notes that Section 11(b) of the License Agreement very specifically says that defendant "shall have *the right but not the obligation* to take action against any infringement or threatened infringement of the Trademarks which affects or is likely to affect the exercise of the License Agreement." [1-1] 13 (emphasis added). What *is* an obligation already in place through the License Agreement is that defendant will bear the expense and cost of enforcement efforts defendant takes on itself. [*Id.*]

Assignments and sales of trademark rights have an additional hurdle. "In order to protect consumers, the assignment of trademark rights must not be separate from the goodwill with which the mark has been associated." *Cobra Cap. LLC v. LaSalle Bank Corp.*, 455 F.Supp.2d 815, 820 (N.D. Ill. 2006). *See La Preferida, Inc. v. Cerveceria Modelo, S.A. De C.V.*, Nos. 86 C 2647, 87 C 4081, 1989 WL 51062, at *2 (N.D. Ill. May 8, 1989) ("The proper inquiry is whether the trademark's good will has been assigned. . . . If not, the transfer is not a sale or assignment."); *Coin-Tainer Co., LLC v. Pap-R Prods. Co.*, No. 19-cv-234, 2021 WL 3054996, at *7 (S.D. Ill. Apr. 26, 2021) ("To ensure an effective assignment of a trademark interest, goodwill must be provided for in the agreement for the assignment."). This applies to both unregistered and registered marks, as it "is the rule at common law and is federal statutory law under § 10 of the Lanham Act, 15 U.S.C.A. § 1060." 2 McCarthy, *supra*, § 18:2 (citations omitted). *See also Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969) ("The law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated. Such was the common law rule and is now made a part of the Lanham Act.") (collecting cases); *Visa, U.S.A., Inc. v. Birmingham Tr. Nat'l Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982) (same). "This is because a trademark is meaningless apart from the good will of the business with which it is associated." *Medscript Pharmacy*, 444 F.Supp.3d at 914 (citation omitted).[28] Assignments and transfers of trademark rights without the goodwill associated with the mark are often referred to as "naked" assignments or "assignments in gross." *See, e.g., Sands, Taylor & Wood Co.*, 978 F.2d at 956; *Medscript Pharmacy*, 444 F.Supp.3d at 914; *Cobra Cap.*, 455 F.Supp.2d at 820. Such an assignment is considered invalid and "passes no rights to the assignee." *Sands, Taylor & Wood Co.*, 978 F.2d at 956. Courts have defined "good will" in the context of trademark law as "the advantage obtained from use of a trademark, including public confidence in the quality of the product and in the warranties made on behalf of the product, and the public's name recognition of the product that differentiates it from others." *Medscript Pharmacy*, 444 F.Supp.3d at

---

[28] *See also* 2 McCarthy, *supra*, § 18:2 ("Because a trademark is the tangible representation or symbol of good will, it cannot be separated from that good will. A trademark has no independent significance apart from the good will it symbolizes."); *Adams Apple Distributing Co. v. Papeleras Reunidas, S.A.*, 773 F.2d 925, 931 (7th Cir. 1985) ("It is true that a trademark is not a property right in gross which may be sold apart from the business or goodwill with which the trademark has been associated.").

914 (quoting *Narula*, 2001 WL 804025, *5). *See also Gaffrig Performance Indus.*, 2003 WL 23144859, at *10 ("Goodwill includes the corporate identity, confidence, reputation, and recognition of the product.") (citing *Sands, Taylor & Wood Co.*, 978 F.2d at 957). "General principles of contract law can be applied to determine whether good will transferred with the assignment." *Ledo Pizza Sys.*, 2024 WL 1013897, at *4. Here, a plain reading shows that nothing in the March 2024 emails between Nelson and Lerner, nor in Nelson's September text, demonstrates or even mentions the goodwill associated with the unique shredded gum configuration. Although not dispositive, an example of an assignment that a court found was not "in gross" stated that it assigned "all right, title and interest in and to the Mark, together with the goodwill of the business symbolized by the mark . . . ." *Cobra Cap. LLC*, 455 F.Supp.2d at 820. There is clearly no such similar language in Lerner's March 26 "offer" email.

Finally, defendant also insists that the March 2024 Agreement is valid because defendant "has performed it" and plaintiffs have "benefitted from it – Ford Gum's enforcement efforts have saved BLC money and preserved the royalty payments it receives from Ford Gum." [34] 2. Defendant argues that it "reasonably relied on the March 2024 Agreement and repeatedly and continuously performed it by filing the Shredded Gum Trade Dress Application on behalf of Ford Gum, sending cease and desist letters on Ford Gum's behalf with regard to two separate Shredded Gum Trade Dress Infringements, and taking other enforcement actions, all at Ford Gum's expense, and to BLC's benefit." [34] 9.[29] Defendant asserts that plaintiffs have benefitted from the March 2024 Agreement "by not having to spend money to register and enforce the Shredded Gum Trade Dress." [51] 9–10.

Whether defendant has established performance of the alleged contract and whether plaintiffs have benefitted from that performance are not considerations relevant to the assessment of whether the March 2024 emails constitute a valid and enforceable contract. Rather, these arguments echo and call to mind defendant's assertions in support of its second affirmative defense of equitable estoppel, which argues that plaintiffs are estopped from owning or claiming ownership of the shredded gum trade dress. [23] 64–65. Count I of defendant's counterclaims seeking a declaratory judgment that defendant owns the shredded gum trade dress puts forth similar arguments, alleging that "[d]ue to their statements and actions," including those surrounding the March 2024 Agreement, plaintiffs are estopped from owning the shredded gum trade dress. [23] 101–03. Regardless, defendant's motion does not

---

[29] *See also* [34] 6 (defendant explaining that it has performed the March 2024 Agreement by "retaining an attorney to prepare and file an application and supporting declaration to register the Shredded Gum Trade Dress with the [USPTO]; preparing cease and desist letters addressed to two different infringers; and taking related actions to stop the infringements") (citing [35] ¶¶ 44–47); [51] 8 (arguing that defendant "has performed the March 2024 Agreement by paying for and filing an application at the USPTO on behalf of Ford Gum, sending the cease and desist letter referred to in the March 2024 Agreement, at Ford Gum's expense, and to Plaintiffs' benefit"), 9 (arguing that the March 2024 Agreement "has been fully performed, at Ford Gum's expense"); [33-2] ¶¶ 19–21 (Lerner's declaration describing the ways in which defendant performed the March 2024 Agreement).

make any argument or provide analysis under any theory of estoppel.[30] Rather, defendant points to its performance and plaintiffs' benefits from that performance as reasons that the Court should find that the March 2024 Agreement constitutes a valid and enforceable contract.

Based on the foregoing, the Court recommends that the District Judge find that defendant has not met its burden to establish a likelihood of success on the merits of defendant's first counterclaim for a declaratory judgment that Ford Gum owns the shredded gum trade dress and its third counterclaim for specific performance of the alleged March 2024 Agreement.

### 2. Defendant's Fourth Counterclaim – Specific Performance of the License Agreement

Defendant's fourth counterclaim seeks specific performance of the License Agreement. [23] 105. Defendant alleges that plaintiffs intend to terminate the License Agreement and contract with another gum manufacturer, thus depriving defendant of its exclusive right to manufacture gum in connection with the BIG LEAGUE CHEW mark "for the next 71 years," *i.e.*, until 2095.[31] [34] 4, 13 (citing [33-6]; [33-13]). *See also* [23] 73 ("Ford Gum seeks a preliminary and permanent injunction to stop Plaintiffs from enacting this threat."). Defendant argues that "if BLC replaces Ford Gum, it will cause irreparable harm to Ford Gum, its employees, the community of Akron, New York, warranting a preliminary injunction against BLC." [34] 7. *See* [35] ¶¶ 171–83 (Spigner declaration).

Whether defendant can show a likelihood of success on the merits of this claim intertwines with the issues previously discussed. Defendant argues that it has "at all times fully performed the License Agreement" and is in compliance with the agreement such that plaintiffs cannot terminate the License Agreement and/or contract with a different manufacturer to replace Ford Gum. [34] 12–13. Plaintiffs

---

[30] In arguing that licensee estoppel does not apply, defendant's brief in opposition to *plaintiffs'* motion for preliminary injunction briefly mentions that defendant's second affirmative defense is equitable estoppel and that equitable estoppel bars plaintiffs' claims. *See* [51] 13–14. But defendant's motion does not explicitly raise or argue estoppel.

[31] It is not clear to the Court where defendant finds support for the assertion that its License Agreement with plaintiffs lasts until 2095. The License Agreement grants defendant the exclusive right to manufacture gum in connection with the BIG LEAGUE CHEW mark for an initial term of fifteen years, *i.e.*, through December 31, 2025. [33-6] 6. The License Agreement provides that "[s]o long as this License Agreement is then in effect and Licensee is not in default," defendant has the option to renew the License Agreement for three consecutive additional five-year terms, *i.e.*, through December 31, 2040. [*Id.*] 7. The third amendment to the License Agreement extended the initial term to twenty-five years, *i.e.*, through December 31, 2045, and provided that, so long as the License Agreement "is then in effect and Licensee is not in default," defendant has the option to renew the License Agreement for two consecutive additional twenty-five year terms, "from January 1, 2046 to December 31, 2071; and from January 1, 2072 to December 31, 2097 . . . ." [33-13] 2. Plaintiffs' opposition brief does not comment on this slight discrepancy, and it is ultimately irrelevant to the instant motions.

disagree, arguing that defendant has breached the License Agreement by, among other things, trying to claim ownership of the shredded gum trade dress and filing the registration application. [52] 17. But more importantly, plaintiffs assert that defendant is not entitled to an injunction regarding performance of the License Agreement because "[w]ith no evidence of an impending breach, Ford Gum fails to make a 'demonstration of how [it] proposes to prove the key elements of its case.'" [52] 17–18 (quoting *Pritzker*, 973 F.3d at 763). The Court agrees that defendant has not shown that plaintiffs have breached or will breach the License Agreement. In support of its assertion that plaintiffs improperly intend to terminate the License Agreement, defendant relies only on a November 18, 2024 article from *The New York Times*[32] that defendant describes as reporting "that BLC said it is seeking to replace Ford Gum with another manufacturer solely over this Shredded Gum Trade Dress ownership dispute." [34] 4 (citing [33-50]). *See also* [35] ¶ 171 (Spigner declaration stating that plaintiffs "have made statements to the media that they intend to terminate the License Agreement and the Equipment Purchasing Agreement"). The identified article specifically states the following:

> Big League Chew's current contract with Ford Gum runs until 2045. It is not clear how any pending litigation would affect the two parties' future. Big League Chew said it is exploring contingency plans to ensure uninterrupted production and distribution of its products.

[33-50] 3; [35] ¶ 171. Defendant's motion reads meaning into the article that is not plainly there and merely speculates about the meaning of "exploring contingency plans." Nothing in this article supports defendant's assertion that plaintiffs intend to terminate the License Agreement or "replace" defendant.

One article that does not explicitly demonstrate the harm defendant fears will happen is insufficient to warrant the "extraordinary remedy" of a preliminary injunction. *Orr*, 953 F.3d at 501 (quoting *Winter*, 555 U.S. at 24). *See Kellytoy Worldwide, Inc.*, 2020 WL 5026255, at *2 (stating that a "preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it") (quoting *Orr*, 953 F.3d at 501). The Court recommends that the District Judge find defendant has not met its burden as to its fourth counterclaim and deny defendant's motion for a preliminary injunction prohibiting plaintiffs from contracting with another gum manufacturer pending trial.

## B. Irreparable Harm/Adequacy of Traditional Legal Remedies

Because the Court has recommended that the District Judge find defendant has not demonstrated a likelihood of success on the merits of any of its counterclaims,

---

[32] More accurately, the article attached as an exhibit is dated November 19, 2024 and appears in *The Athletic*, which is owned by *The New York Times*.

the Court need not engage in an analysis of whether defendant has established irreparable harm or that there is no adequate remedy at law.

## C.   Conclusion

The Court recommends that the District Judge find that defendant has not met its burden to demonstrate a likelihood of success on the merits and, accordingly, deny defendant's motion for preliminary injunction.

* * * * * *

The Court recommends that, for all of the reasons outlined above, the District Judge find that neither plaintiffs nor defendant have demonstrated a likelihood of success on the merits and deny both plaintiffs' and defendant's motions for preliminary injunctions. The Court recognizes that in the case of cross-motions for preliminary injunctions, "[d]enying both parties injunctive relief . . . is not a comfortable posture for the Court to assume' because it 'is tantamount to holding that both parties are free to offer their products for sale in the same marketplace." *TMT N. Am.*, 124 F.3d at 885 (citation and internal quotations omitted). But that is not quite the factual circumstances of the present case. Furthermore, a "preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *loanDepot.com, LLC v. Schneider*, 647 F.Supp.3d 620, 627 (N.D. Ill. 2022) (quoting *Winter*, 555 U.S. at 22). And the "party seeking a preliminary injunction bears the burden of showing that it is warranted." *Finch*, 82 F.4th at 578 (quoting *Speech First, Inc.*, 968 F.3d at 637). The Court recommends that the District Judge find that neither party has met that burden.

**Conclusion**

For the foregoing reasons, and in accordance with 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(1), the undersigned respectfully recommends that the District Judge deny plaintiffs' motion for preliminary injunction [8] and deny defendant's motion for preliminary injunction [32]. The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file a timely objection will constitute a waiver of objections on appeal. *See Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 760 (7th Cir. 2009); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: April 10, 2025**